Lyndall Lenear AINSWORTH, Appellant,

v.

The STATE of Texas, Appellee.

No. 45729.

Court of Criminal Appeals of Texas.

April 18, 1973.

Rehearing Denied May 9, 1973.

Elaine Hocker and Allan J. Showers, Houston, for appellant.

Carol Vance, Dist. Atty., James C. Brough, Jim Skelton, Asst. Dist. Attys., Houston, Jim D. Vollers, State's Atty., and Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This is an appeal from a conviction for the offense of robbery by assault; the punishment was assessed by the court at 12 years.

We are faced at the outset with a challenge to the sufficiency of the evidence to connect appellant with the offense.

The record reflects that appellant was indicted, together with Michael Freeze, Bob Murphy, Joel Taylor and Tom Moody, for the robbery of Jerry Ziegler, the manager of an A & P grocery store in South Houston. Joel Taylor, Tom Moody and the appellant were tried together in this cause.

The state's evidence was adduced primarily from four witnesses: Michael Freeze, an accomplice witness; Jerry Ziegler, the person robbed; Jose Rousseau, a stock checker for the A & P store; and Lieutenant Brookover, the arresting officer.

Michael Freeze, the accomplice witness, related that on the day of the robbery he, the appellant, co-defendants Taylor and Moody, and the co-indictee Bob Murphy gathered at Moody's apartment and planned the robbery.

Pursuant to plan, they left Moody's apartment in two cars, a white Buick and an El Camino. The El Camino was parked within a mile of the A & P store. Taylor was left there to pretend he was having car trouble. The appellant, Moody, Murphy and Freeze drove the Buick to the A & P store and parked it around the corner from its entrance. Appellant entered the store first and took a lookout position near the store's window. Then Murphy and Freeze entered the store and asked the manager whether he would cash a payroll check. After the manager, Jerry Ziegler, refused to cash the check, Freeze pointed his pistol at the manager and told him to give them the money from the store's safe. Freeze and Murphy followed the manager into the office at which time Murphy handed him a sack in which to put the money. After all of the money in the safe had been emptied into the sack and after Freeze and Murphy left the manager's office, appellant ran out of the store. Murphy and Freeze ran out behind him. All three ran to where the Buick was parked and where Moody was waiting. As they approached the car Moody asked, "Did you get it?" and Freeze answered, "Yes, let's go!" The four men, with Moody driving, left in the Buick and drove to where the El Camino had been left. Once there, the guns and money were transferred to the El Camino. Then Taylor and Moody departed in the Buick. Freeze, Murphy and the appellant changed to the El Camino and went back to the apartment to await the arrival of their companions. They waited there until 5:30 P.M. and finally decided to call the South Houston Police Department to see if their companions had been arrested. When they found that they had been, appellant called his lawyer. Freeze left Moody's apartment shortly thereafter and before the police arrived. A month later, he gave himself up to the police.

Jerry Ziegler testified that around 4:00 P.M. two men (referred to as "A" and "B") approached him and asked him whether he could cash a payroll check. After he refused to cash the check, "A" pointed a pistol at him and said, "I've got a gun. I will kill you. Get me the money out of the office; don't make a funny move." "B" handed him a sack, which he described as a paper sack similar to a grocery sack. He and the two robbers went back to the office where Ziegler took all of the money

out of the safe and put it in the sack. He testified that approximately $400 to $500 was taken from the safe.[1] The manager stated that "A" told him to lie on the floor and not make a move; there was another man in the store that had a gun on him. "A" was described by the manager as being athletic looking and wore a banlon shirt. He described "B" as having a beard, long hair, and "wore a blue, golf cap with a band around it."

Jose Rousseau, a stock checker in the store, testified that he was standing in an aisle directly in front of the manager's office when he first became aware that a robbery was taking place. He saw two men enter the office with the manager and could see the manager taking money from the safe and putting it in a sack. He testified that he looked around the store and noticed a third man, (referred to as "C") whom he identified as the appellant, standing near the store's window, looking in and out of the store. There were only eight or nine other people in the store at the time. He stated that the appellant hurriedly left the store and that he was followed by "A" and "B". The three men ran down a sidewalk to an adjacent mall where a white, 1960 Buick was parked. Rousseau followed the men from a distance of 12–14 feet. The three men met a fourth man, "D", who was standing near the parked Buick. Rousseau stated that he overheard "D" yell, "Did you get it?" and one of the other men answered, "Yes, we got it, let's go!" Although he did not see appellant get into the car, he did notice that there were four men in the car as it drove away. He identified "D", the driver of the get-away car, as Tom Moody, one of appellant's co-defendants. He also identified "A" as the accomplice witness Michael Freeze. A description of the get-away car was given to the police by Rousseau.[2]

Officer Brookover testified that shortly after the robbery he arrested two men who were in an automobile which met the description of the reported get-away car. The two men were identified by the officer as co-defendants Moody and Taylor. No fruits of the crime were discovered in the car. Moody gave Officer Brookover the address of his apartment but cautioned that "it's possible that there could be someone hurt if you went there." With consent of Moody, Brookover and several other officers of the Houston Police Department proceeded to Moody's apartment where they found and arrested appellant and a woman by the name of Joann Sims.

A search of the apartment produced a .32 caliber pistol, a .22 caliber pistol, a blue golf hat, and a sack of money in which were found coins which were rolled in Texas National Bank of Commerce wrappers.

Freeze identified one of the two pistols as the one he used in the robbery, and although he could not make identification of the other pistol recovered in the search, he did testify that Murphy also had a pistol during the robbery. When shown the money recovered from Moody's apartment, Ziegler testified that some of the coins taken in the robbery were rolled in Texas National Bank of Commerce wrappers. Both Ziegler and Rousseau testified that State's Exhibit No. 3, a blue golf hat, looked like the one worn by one of the robbers.

The jury was charged on the law of principals and that Michael Freeze was an accomplice witness as a matter of law. The testimony of witness Rousseau sufficiently corroborates the accomplice's testimony. Article 38.14, Vernon's Ann.C.C.P.; Runkle v. State, Tex.Cr.App., 484 S.W.2d 912. Further, the testimony of Rousseau is

---

1. The exact amount was determined by a supervisor to be $467.50.

2. Rousseau described the car as being a white, 1960 Buick, bearing Texas license plates number PYD 918. "The car was dirty" and "the back, left light had been cracked." He added that there was rust around the plates.

sufficient to sustain appellant's conviction as a principal in the robbery notwithstanding the testimony of the accomplice witness. The evidence is clearly sufficient to support the verdict. Hill v. State, Tex.Cr. App., 466 S.W.2d 791; Jones v. State, Tex.Cr.App., 436 S.W.2d 151.

Appellant next contends that he was denied a jury determination on the issue of present insanity or competency to stand trial. His complaint arises out of the following circumstances.

After the state had rested its case in chief, and after appellant's co-defendants had rested, counsel for appellant approached the bench and announced:

"It's been brought to my attention within the last fifteen minutes or so, during the last recess of the court, that my client, Lyndall Lenear Ainsworth, is an escapee or has been committed to the Rusk Mental Institution at a prior time and has never had his sanity restored by a jury to my knowledge. I don't know, and there is an attorney in town that supposedly can verify this. This is all I know."

Appellant then testified, out of the presence of the jury, that he was committed to Rusk State Hosptial by the Trinity County Judge on July 16, 1966; that he received several shock treatments; and that he escaped from Rusk "a couple of months" after his admittance. He further testified that he had been arrested "forty something times for assault and kidnapping" and that on one occasion he had chopped off the hand of a person who had thrown a brick through his car window.

Asked whether appellant's present sanity was being questioned, counsel for appellant responded:

"Well, this has been a surprise to me, Your Honor, I think it is my duty to bring it up to the court. What legal ramifications there are, I don't know right now, other than the fact if he was declared insane back then, whether he's ever been declared sane again by a jury or whatever the procedures are, whether he automatically is declared sane by escaping, I don't know."

The court then announced:

"I think this matter might demand that some further investigation be made into it and if you wish to do so, we will resume tomorrow morning at 9:30."

And the prosecutor suggested:

". . . If he's going to testify, I would prefer to have a doctor look at him. I'm not sure if he's capable of testifying."

J. C. Thomason, an investigator for the District Attorney's office, testified that he talked to the custodian of the library and files at Rusk and was informed that appellant had been admitted to Rusk for a ninety-day, temporary commitment.

On December 2, 1970, the court reconvened at which time Dr. Benjamin Sher, a psychiatrist, testified that at the court's request he examined appellant for over an hour. He stated that he conducted a "routine psychiatric evaluation, utilizing a long attitudinal history, and as much background information as was available," particularly to determine if appellant was aware of the nature and quality of his acts, if he had substantial capacity to understand the consequences of his conduct, if he was able to appreciate the present situation he found himself in, if he was competent to understand the proceedings and whether he was able to assist in his own defense. It was the psychiatrist's conclusion that there was nothing to indicate that there was any defect of reasoning; that appellant was aware of the nature and quality of his acts; that he had substantial capacity to appreciate the consequences of his conduct; that he could conform his behavior to the requirements of the law, and that he was competent to understand the proceedings against him and could properly assist in his own defense. Upon cross-examination the psychiatrist insisted:

"I feel he is completely competent to understand what is happening, the proceed-

ings and to assist in his own defense. I don't have any doubt from that standpoint."

At the conclusion of Dr. Sher's testimony appellant filed a motion for "mistrial and/or continuance." Appellant testified in support of the motion. His testimony was that he was committed to Rusk and escaped a couple of months later, that he told no one about the commitment because he was embarrassed about it; and that he finally told his attorney about his commitment during the court's recess prior to the state resting its case in chief.

Jim Skelton, Assistant District Attorney, testified that the "rap sheet" on appellant indicated that appellant had been incarcerated in Rusk State Hospital, and that he had subsequently escaped, but that he had not noticed this information until after appellant's counsel mentioned it in court.

Appellant's motion for "mistrial and/or continuance" was denied, the jury was returned and the trial continued with appellant testifying in his own behalf.

Appellant's complaint, as stated above, is that he was denied his right to a jury finding on the issue of present insanity. It is clear from the record that a jury was not empaneled to decide the question of whether appellant was competent to stand trial. It is equally clear that a jury must determine the question of present sanity or competence "if supported by competent testimony," Article 46.02, Section 2, (b)(1), V. A.C.C.P.; Vardas v. State, Tex.Cr.App., 488 S.W.2d 467; Hefley v. State, Tex. Civ.App., 480 S.W.2d 810; Townsend v. State, Tex.Cr.App., 427 S.W.2d 55. However, it is left to the discretion of the trial judge to determine whether the issue of present insanity or competency exists. Therefore, the question presented here is whether the trial judge abused his discretion in determining that the question of present insanity or competency to stand trial was not supported by competent testimony.

Recently, in Vardas v. State, supra, we stated:

"Even where no request or demand is made for a preliminary hearing but evidence as to the accused's present incompetence becomes sufficiently manifest during the trial on the merits, then due process of law would require the trial judge to halt the trial and conduct a hearing on that issue on his own initiative before proceeding further. See Pate v. Robinson, *supra* [383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815.] While *Pate* would not require a jury finding on the issue, Texas law would. Townsend v. State, supra."

And in Boss v. State, Tex.Cr.App., 489 S.W.2d 580, we again spoke to the standard required to raise the issue requiring a separate hearing and said:

" . . . The trial judge is not required to conduct such a hearing on his own motion absent any significant facts being brought to his attention or absent circumstances and actions which should have indicated a need for a separate determination."

An accused is not required to prove actual insanity or incompetency before the trial judge is required to conduct a separate hearing on the matter. If this were the rule, the separate hearing procedure would become meaningless. However, it is necessary that evidence come before the court, from some source, of sufficient force to create in the court's mind reasonable ground for the judge to doubt the competency of the accused to stand trial.[3] Once this occurs, the court should conduct a hearing out of the presence of the jury to determine whether or not there is in fact an issue as to the competence of the accused to stand trial. If such an issue

---

3. In this case there had not been a prior adjudication of insanity. Compare Gephart v. State, 157 Tex.Cr.R. 414, 249 S.W.2d 612.

does in fact exist, the trial court is required to empanel a jury to determine the issue. Art. 46.02, supra.

Here, appellant testified that he had been declared mentally ill and committed to Rusk State Hospital for observation and treatment and that he had escaped a couple of months later. The temporary commitment relied upon by appellant to raise the issue of present incompetence finds him mentally ill, but does not find him mentally incompetent. Article 5547–83(b), Vernon's Ann.Civ.St. provides:

"The judicial determination that a person is mentally ill or the admission or commitment of a person to a mental hospital, without a finding that he is mentally incompetent, does not constitute a determination or adjudication of the mental competency of the person and does not abridge his rights as a citizen or affect his property rights or legal capacity."

■ Although the fact that appellant was previously determined to be mentally ill is not tantamount to a finding of incompetency, this fact, standing alone, could be sufficient to raise the issue of present incompetency so as to require the trial judge to halt the proceedings and empanel a jury to determine the issue. However, the fact of appellant's previous commitment does not stand alone in the instant case. The trial judge placed appellant on the stand and asked him several questions, presumably for the purpose of evaluating his competency to stand trial. The record reflects that appellant's answers were responsive and coherent and evidenced an adequate understanding of his present situation. The record also reflects the following exchange between the trial court and appellant's counsel:

"THE COURT: Have you had any difficulty in communicating this problem with him? I realize counsel that you haven't been able to convince your client of this, but I'm talking about does he understand, so far as you can tell, the advice that you are giving him and the possible legal implications of the advice that you are giving him?"

"MR. TIPTON: Yes, Your Honor, I believe he does."

The psychiatrist's testimony was unequivocal that appellant was competent to stand trial notwithstanding the prior commitment. The test for determining incompetency to stand trial is "whether (the defendant) has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); Sandlin v. State, Tex.Cr.App., 477 S.W.2d 870.

■ There is no indication in the record that at the time of trial appellant was unable rationally and understandingly to consult with his counsel or that he did not have a rational and factual understanding of the charges against him. The earlier diagnosis that appellant was mentally ill and needed "observation and/or treatment" means little when contrasted with the present evaluation by his own counsel, the trial court and the psychiatrist on the question of present competency. The trial judge was aware of the question; inquired into the matter with counsel and with appellant personally, adduced testimony from a psychiatrist on the question and made a determination that the issue of present incompetence did not exist. The record supports his determination and therefore no abuse of discretion is shown. See Zapata v. State, Tex.Cr.App., 493 S.W.2d 801 (1973).

Appellant also urges that the trial court erred in denying his motion for continuance. As noted above, a hearing was had out of the jury's presence on appellant's motion for "mistrial and/or continuance." Appellant's argument appears to be that he

needed more time to prepare a defense of insanity. However, it is clear that his argument was based on present incompetence to stand trial and did not rest upon or embrace the defensive issue of insanity at time of the offense. No charge was given on the issue of insanity nor was one requested. Appellant did not request additional time to obtain further psychiatric examinations. Appellant did not object to the court's ruling on his motion for continuance and did not mention the motion for continuance in his Motion for New Trial, except possibly indirectly by the following ground:

"That the Court committed reversible error by continuing the trial in this cause of action until the question of Defendant Ainsworth's sanity was resolved and thereby denied him his right to have said issue determined by a jury as to whether he was competent to stand trial in this cause."

No evidence was offered at the hearing on his Motion for New Trial to show how he was harmed by the court's denial of his motion for continuance. The record reflects only the following:

"THE COURT: Counsel do you wish to offer any evidence in connection with your motion for a new trial or amended motion?

MR. TIPTON: Your Honor, the only evidence that I would seek to offer is to anticipate a post conviction sanity hearing that will probably be in the best interest of all that we will have tomorrow, and I'd like the record to have the sanity hearing, whatever, to be included in the record on appeal. I do have witnesses I would like to call which I think will be relevant to this case and to the defendant's present sanity.

THE COURT: There's been no application filed at this point?

MR. TIPTON: No, I anticipate filing *one* application to have this hearing."

The following morning, January 26, 1971, a post-conviction sanity hearing was had in compliance with Article 46.02, V.A. C.C.P., at the conclusion of which the jury found that appellant was not presently insane, did not require hospitalization or treatment. Compare Sandlin v. State, Tex.Cr.App., 477 S.W.2d 870.

Appellant next contends that the court erred in admitting evidence obtained in an illegal search.

As previously mentioned, a search was conducted of Tommy Moody's apartment and the items seized in the search were used to support the state's theory of the case. It is appellant's argument that since no search warrant was obtained, the search was illegal and its fruits were inadmissible. The state counters that no warrant was required because Moody consented to the search of his apartment.

"The protections afforded by the Fourth Amendment and the State Constitution (Article 1, Sec. 9, Texas Constitution) against unreasonable searches and seizures may, like other constitutional rights, be waived. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). 51 Tex.Jur.2d, Rev., Part 1, Searches and Seizures § 42, p. 720. By consenting to a search, an individual may waive his constitutional right and dispense altogether with the necessity of a warrant." Paprskar v. State, Tex.Cr.App., 484 S.W.2d 731, 737.

It is well settled that the burden is upon the state to show that the consent was freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; DeVoyle v. State, Tex.Cr.App., 471 S.W.2d 77; Allen v. State, Tex.Cr.App., 487 S.W.2d 120. Paprskar v. State, supra.

The record reflects that after Moody was arrested, he was advised of his constitutional rights, first by an arresting officer and later by a magistrate. After these warnings he was interrogated and according to the testimony of Officer Brookover,

he consented to the search of his apartment. There is no implication in the record of an attempt to coerce or dominate Moody, either physically or by use of other techniques of suggestion. The officer's testimony went uncontroverted on the matter of consent to search even though Moody himself testified on the motion to suppress.

The only challenge to the state's consent theory came during cross-examination of Officer Brookover. The record reflects the following exchange:

"Q. Isn't it a fact, Officer, that he did not give you permission, that only interrogation, that any oral statement concerning these exhibits was after you procured them?

A. No sir.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. You did not incorporate into the report the fact that Tommy Moody gave you permission to go there?

A. Correct."

 Appellant points out in a most able brief that the burden on the state to prove the voluntary nature of a consent to search is particularly heavy when the consentee is under arrest at the time of the consent. However, where, as here, there is no evidence offered that is inconsistent with consent, we cannot say the state failed to meet its burden. The fact that a person is under arrest does not, in and of itself, prevent a free and voluntary consent from being given. Paprskar v. State, supra; Brown v. State, Tex.Cr.App., 443 S.W.2d 261; Weeks v. State, Tex.Cr.App., 417 S.W.2d 716, cert. den. 389 U.S. 996, 88 S.Ct. 500, 19 L.Ed.2d 494. Appellant's contention that the consent was involuntarily given is not supported by the evidence.

Appellant's last contention is that the trial court erred by not submitting the legality of the search and seizure to the jury. His complaint is based on the language of Article 38.23, V.A.C.C.P., which provides:

"No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

"In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained."

No fact issue was raised by the evidence on the question of consent. The question of the legality of the search was a matter of law rather than fact. Campbell v. State, Tex.Cr.App., 492 S.W.2d 956 (1973); Black v. State, Tex.Cr.App., 491 S.W.2d 428 (1973).

No reversible error having been shown, the judgment is affirmed.