**Ex parte Edward Otho HAGANS.**

No. 55504.

Court of Criminal Appeals of Texas.

Nov. 9, 1977.

State's Motion for Rehearing Denied Dec. 14, 1977.

Edith L. James, Dallas, for appellant.

Max P. Flusche, Jr., Asst. Atty. Gen., Austin, Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is a post-conviction habeas corpus proceeding under Article 11.07, Vernon's Ann.C.C.P., in which appellant seeks to set aside his 1961 murder conviction in which he was originally assessed the death penalty.[1] His conviction was affirmed in *Hagans v. State*, 372 S.W.2d 946 (Tex.Cr.App.1963).

It is petitioner's contention that he was denied due process of law in his 1961 trial by the failure to conduct a separate hearing on his competency to stand trial in accordance with the mandate of *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), which has been held to be retroactive. See *Ex parte Halford*, 536 S.W.2d 230 (Tex.Cr.App.1976), and cases there cited.

■ Following the conclusion of the post-conviction habeas corpus hearing, the court filed findings of fact and conclusions of law denying relief. This court is, of course, not bound by such findings of fact and conclu-

sions of law. *Ex parte Bazemore*, 430 S.W.2d 205 (Tex.Cr.App.1968); *Ex parte Williams*, 486 S.W.2d 566 (Tex.Cr.App. 1972); *Ex parte Swinney*, 499 S.W.2d 101 (Tex.Cr.App.1973); *Ex parte Bagley*, 509 S.W.2d 332 (Tex.Cr.App.1974); *Ex parte Lemay*, 525 S.W.2d 1 (Tex.Cr.App.1975); *Ex parte Davila*, 530 S.W.2d 543 (Tex.Cr. App.1975); *Ex parte Garcia*, 548 S.W.2d 405 (Tex.Cr.App.1977).

At the habeas corpus hearing, the attorney for petitioner at his 1961 trial testified that he was not a doctor and could not truthfully say whether petitioner was competent to stand trial or waive any of his rights in 1961. He related that petitioner had not given him the assistance he needed concerning petitioner's mental condition. Counsel stated, "[h]e either did not know it or would not give it or was not competent to give it . . . I was unable to get anything to help me concerning his mental condition." He did talk to petitioner at length about the facts of the case, but "I was not satisfied at all with the information that he had given me." He acknowledged that no request was made for a separate sanity hearing as authorized by Article 932b, Vernon's Ann.C.C.P., then in effect. He explained the doctors who testified at the trial had agreed to do so without compensation and he didn't think they would testify twice, and further, he didn't want to alert the prosecution as to the defense to be offered. Counsel stated he did not discuss strategy about not filing a pre-trial request for a separate sanity hearing with appellant, but did make his mother and sister aware of such strategy.

In addition to the attorney's testimony, the record of the 1961 trial was introduced into evidence at the habeas corpus proceedings. That record reflects the brutal murder of Mrs. Zoura Hagans, the widow of petitioner's deceased uncle, and her sister, in Nacogdoches, an eventual flight to California, where the petitioner surrendered to the F.B.I. Upon return to Texas, he made a written confession. The record reflects

---

1. His sentence was commuted to life imprisonment following the decision in *Furman v. Geor-*

*gia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

there was testimony from three psychiatrists and two general practitioners.

The record of the 1961 trial reflects that before the alleged murder Dr. Robert Denman, a general practitioner, examined the petitioner in June, 1960 at the Little York Hospital in Houston, where it was reported he had a convulsion and complained of stomach pain. It appeared petitioner had been drinking heavily. An X-ray showed a thickening in the frontal area of appellant's skull, most likely due to injury and resulting in intracranial pressure. An electroencephalogram test showed his brain waves were abnormal and indicated brain impairment. Dr. Denman advised petitioner's mother that there was permanent brain damage which was not repairable, coupled with a psychiatric problem which would worsen without treatment. He referred the appellant to Dr. Eugene Tipps, a psychiatrist, since he felt the appellant could become violent or harmful to the family or some other person. Petitioner's wife, Hazel, who was a nurse's aide at the hospital, had been seen by Dr. Denman with bruises and had told the doctor that the petitioner had beaten her. When asked if the appellant knew right from wrong, the witness stated, "I would say that he is inconsistent and that sometimes he does and sometimes he doesn't." The doctor further related he had seen the appellant on occasions in the hospital when he (the witness) did not think the appellant knew the difference between right and wrong.

Dr. Tipps testified that he examined and treated the petitioner on July 1 and July 18, 1960. He learned that petitioner had convulsions as an infant, apparently due to a birth injury, that he quit school at age nine and had psychiatric evaluation several years later by a Dr. Harris, who told his parents he had brain damage. An electroencephalogram at that time showed abnormal brain wave tracings. He was given anti-convulsant medication. At age nineteen in 1952, he was in an automobile wreck and was unconscious for eighteen days and later developed blackouts. In 1957, he was in a motorcycle wreck and was unconscious for seven days. His blackouts then became more frequent, occurring two or three times a day, but he had no true epileptic attacks according to Tipps until a few days before his admittance to the hospital in June, 1960. Tipps related the results of the encephalogram test ordered by Dr. Denman and knew there was brain damage and intracranial pressure, and stated abnormal brain waves are not present unless there is brain impairment or epilepsy. In addition, he related that there was an emotional impairment, a marked loss of emotional control.

Tipps related petitioner's condition would not improve with time, and there was no cure for it. He related that in trying to communicate with the petitioner he could not "get through" to him and "it was like a pane of glass between us." He prescribed librium for the epilepsy, which had a tendency to level out the brain waves. Dr. Tipps also advised petitioner's mother that the petitioner was dangerous to himself and others and should be in custodial care. He further testified that petitioner did not have the same moral concept as a normal person, and did not have the same interpretation of right and wrong as a normal person.

Dr. Frank Zimmerman, resident psychiatrist of the Titus-Harris Clinic, affiliated with John Sealy Hospital, testified the records at the clinic indicated that brain wave tests conducted there on petitioner in 1948 and 1949 indicated abnormality. The records also showed a standardized IQ test indicated petitioner's IQ to be 83, in the range of dull normal. His mental age was shown to be eleven years and eight months with twelve years and six months as the maximum mental age he would reach in his lifetime. The records also revealed petitioner was suffering from epilepsy at the time of the tests.

Dr. Tedrow J. Ford, Jr., a first cousin of petitioner, testified that petitioner had an injury at birth and his facial features had been paralyzed since then. He related that in infancy and early childhood petitioner had been taken to various medical centers over the county, and his parents had spent all they could afford for their son.

Dr. James H. Kreimeyer, Clinical Director at Rusk State Hospital, called by the State, testified as to the results of the standardized intelligence test previously mentioned which had been administered to petitioner. He said results indicated petitioner was a dull normal and such score as made could be considered as reflecting a mild or questionable mental defectiveness. He testified that psychomotor epilepsy patients usually are not able to remember what occurred during the time they have seizures as they have amnesia for that period of time.

This was the medical testimony offered at the 1961 trial.

In the court's charge it submitted to the jury the issues of insanity at the time of the commission and insanity at the time of the trial (competency). The jury found the petitioner was sane at both times.

The record before us reflects that in 1964 appellant was found to be then insane by another jury on much the same evidence as offered at his 1961 trial plus evidence of deterioration since his confinement in the Department of Corrections. He was committed to Rusk State Hospital. Restoration proceedings were had in 1973, and appellant was returned to the Department of Corrections.

In *Pate v. Robinson*, supra, upon which the appellant relies, the United States Supreme Court made clear "that the conviction of an accused person while he is legally incompetent violates due process . . . and that state procedures must be adequate to protect this right." *Pate* held that the trial court should conduct a competency to stand trial hearing whenever "the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial.[2] Under the holding of *Pate*, the lack of a hearing on competency to stand trial once the issue is properly raised affects the fact-finding process. *Ex parte Halford*, supra.

Therefore, the issue presented is whether there was sufficient evidence before the trial court in 1961 to raise a bona fide doubt as to petitioner's competence to stand trial.

In *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the United States Supreme Court identified some of the factors which are relevant to a determination of competency to stand trial:

"The import of our decision in *Pate v. Robinson* is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts."

We observe that at the 1961 trial the trial judge considered the issue of present insanity (competency to stand trial) as raised by the evidence for he charged on said issue. While the standard for submitting a defensive issue to the jury[3] is a lesser standard than that of the "bona fide

---

2. While the court in *Pate* did not reveal the extent of the inquiry necessary to satisfy due process requirements, it would appear at the minimum that a separate hearing for determination of competency is obligatory though not necessarily a preliminary one. While *Pate* would not require a jury trial on such issue, Texas law in effect at the time of appellant's trial would. See *Townsend v. State*, 427 S.W.2d 55 (Tex.Cr.App.1968).

3. " . . . The defendant has a right to an affirmative instruction on every defensive issue raised by the evidence whether the evidence is produced by the state or by the defense, whether it is strong or feeble, whether it is unimpeached or contradicted, or whether it is conflicting. Where the truth of the testimony is for the jury to determine, a charge on a defensive issue raised by the testimony should be given, even if the trial court is of the opinion that the testimony is not entitled to credence." 31 Tex.Jur.2d, Instructions, § 110, pp. 660–661.

doubt" requirement of *Pate v. Robinson,* *supra,* nevertheless, the fact that the charge was given is a factor to be considered. While the 1961 trial testimony did not focus upon the petitioner's competency to stand trial, we conclude that there was a "bona fide doubt" about petitioner's competency to stand trial in 1961. See and cf. *Ex parte Halford, supra.*

■ There are other reasons why petitioner is entitled to the relief he seeks. The conviction of an accused while he is legally incompetent to assist in his own defense violates fundamental interests of due process. *Bishop v. United States,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); *Bruce v. Estelle,* 483 F.2d 1031 (5th Cir. 1973); *Martin v. Estelle,* 546 F.2d 177 (5th Cir. 1977). And as earlier noted, State procedures must be adequate to protect this right, *Pate v. Robinson, supra; Ainsworth v. State,* 493 S.W.2d 517 (Tex.Cr.App.1973). "[A]nd the minimum standard allowable, as implicitly dictated by *Pate,* and as applied by the Texas courts, *Townsend v. State,* Tex.Cr. App.1968, 427 S.W.2d 55, must include a separate hearing for determination of competency. Texas law adequately attempts to protect this right by providing that, where there is evidence to support a finding of incompetency to stand trial, a jury shall be impaneled, separate from the jury selected to determine guilt or innocence of the defendant, to determine defendant's competency to stand trial.[4] Tex.Crim.Proc.Code Ann., Art. 46.02, § 4(a). See *Cavender v. State,* Tex.Cr.App.1974, 515 S.W.2d 277; *Townsend v. State, supra; Morales v. State,* Tex.Cr.App.1968, 427 S.W.2d 51." *Martin v. Estelle, supra.*

■ The necessity of the separate hearing on the question of competency is so that the determination of an accused's competency can be made "uncluttered by evidence of the offense itself." *Townsend v. State,* 427 S.W.2d 55, 63 (Tex.Cr.App.1968). Such separate uncluttered hearing before a jury makes it easier to determine fairly the issue of competency without introducing facts which might tend to cloud the issue at hand, "facts which alone might well so stir the minds of the jury as to make difficult the exercise of calm judgment upon the question of present [incompetency]," *Ramirez v. State,* 92 Tex.Cr.R. 38, 241 S.W. 1020, 1021 (1922). See also *Lee v. Alabama,* 386 F.2d 97 (5th Cir. 1967).

■ While Article 46.02, Vernon's Ann.C. C.P., was not in effect in 1961, the decision in *Ramirez* had been made, and the later decisions in *Townsend* and *Morales* are applicable. Due process was violated in the instant case by submitting the issue of competency to the same jury on the trial on the merits. See and cf. *Noble v. State,* 505 S.W.2d 543 (Tex.Cr.App.1974); *Ainsworth v. State, supra; Vardas v. State,* 488 S.W.2d 467 (Tex.Cr.App.1973); *Hefley v. State,* 480 S.W.2d 810 (Tex.Civ.App.1972); *Cavender v. State,* 515 S.W.2d 277 (Tex.Cr.App.1974), and cases cited.

Still another matter must be observed.

■ The test of legal competence to stand trial is whether the accused has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *Sandlin v. State,* 477 S.W.2d 870 (Tex.Cr.App.1972). See also *Paul v. State,* 544 S.W.2d 668 (Tex.Cr.App.1976); *Bonner v. State,* 520 S.W.2d 901 (Tex.Cr.App.1975); *Reeves v. State,* 516 S.W.2d 410 (Tex.Cr. App.1974); *Quintanilla v. State,* 508 S.W.2d 647 (Tex.Cr.App.1974); *United States v. Makris,* 535 F.2d 899 (5th Cir. 1976).

In discussing the *Dusky* standard, the Fifth Circuit Court of Appeals in *Martin v. Estelle, supra,* stated:

".  .  . This standard differs materially from the criteria by which trial juries are required to determine sanity at the time of a criminal act.

"When a defense of insanity is presented 'the question is whether the defendant's mental condition at the time of the

4. See footnote # 2.

criminal act was such that he should not be held responsible for his conduct. The question of competency to stand trial relates rather to the appropriateness of conducting the criminal proceeding in light of the defendant's present inability to participate effectively . . . One who cannot comprehend the proceedings may not appreciate what information is relevant to the proof of his innocence. Moreover, many of the rights afforded the defendant in a criminal trial, such as the right to consult with counsel, the right to testify in one's own behalf, and the right to confront opposing witnesses, provide safeguards for the accuracy of the result. To exercise these rights in a meaningful way, the defendant must have some ability to confer intelligently, to testify coherently, and to follow and evaluate the evidence presented.' Comment, 81 Harv.L.Rev. 454, 457 (1967)."

And in *Bruce v. Estelle*, 483 F.2d 1031 (5th Cir. 1973), the court wrote:

". . . It is not necessary for us to reach the question whether the State of Texas should or should not use the M'Naghten rule to determine criminal responsibility at the time of the alleged crime.[5] * * * However, we are firm in the conclusion that the M'Naghten rule cannot be used as a standard to determine competency to stand trial. Again we emphasize that the appropriate standard required by the federal constitution is set forth with simple clarity in *Dusky v. United States*, supra. * * *

"The *Dusky* standard emanates from and is given vitality by the due process clause of the fifth amendment. Thus, like many other constitutional protections, the standards utilized for a determination of whether these numerous guarantees have been accorded must be national in application. The standards for judging competency to stand trial fall into the same category as those constitutional principles which govern jury composition, voter participation, freedom of speech and other federally protected rights.

"Here the state record is replete with examples of the use of the M'Naghten standard as a basis for judging Bruce's competency to stand trial. The M'Naghten rule has no relevance to an intelligent resolution of the competency issue at the time of trial, regardless of the particular standard employed by a state. Whether one knows the difference between 'right and wrong' during his trial is unrelated to the crucial factors which compose the *Dusky* standard."

■ In the instant case, although both the issues of insanity at the time of the commission of the offense and insanity at the time of trial (present insanity) (incompetency) were submitted to the jury, only the M'Naghten standard was given to the jury to determine both issues. This was an improper standard with regard to the competency issue.

■ As to any question of whether the petitioner waived his right to a separate hearing on the issue of competency to stand trial, it must be remembered there can be no waiver because an accused failed to assert his right to such hearing. The United States Supreme Court has held that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." In *Taylor v. United States*, 282 F.2d 16, 23 (8th Cir. 1960), the court stated, "[I]f one is mentally incompetent, then by definition, he cannot expect to raise that contention before the trial court and thus cannot be prejudiced by his failure to do so." Accord: *Carroll v. Beto*, 421 F.2d 1065, 1067 (5th Cir. 1970). See also *Floyd v. United States*, 365 F.2d 368, 377 (5th Cir. 1966); *Nelms v. United States*, 318 F.2d 150, 152–153 (4th Cir. 1963); *Smith v. United States*, 267 F.2d 210, 212 (9th Cir. 1959).

---

**5.** The M'Naghten rule is no longer the standard for deciding criminal responsibility in Texas— see V.T.C.A., Penal Code, § 8.01.

In summary, we conclude that the evidence was sufficient to conclude that there was raised a bona fide doubt about petitioner's competency to stand trial, that he was denied due process when the issue of competency was submitted to the trial jury along with all other issues involved in the case, and that an improper standard was used in submitting the issue of competency to the jury.

The relief sought is granted and petitioner is ordered to be released to the sheriff of Nacogdoches County to answer the indictment.

DOUGLAS, J., not participating.