

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,038

## US CARNELL PETETAN, JR., Appellant

## v.

## THE STATE OF TEXAS

## ON REHEARING UPON COURT'S OWN MOTION
## FROM CAUSE NO. 2012-2331-C1 IN THE 19TH DISTRICT COURT
## McLENNAN COUNTY

**NEWELL, J. filed an opinion in which HERVEY, RICHARDSON, WALKER and McCLURE, JJ., joined. KELLER, P.J., filed a dissenting opinion in which YEARY, KEEL and SLAUGHTER, JJ., joined.**

Appellant was convicted of the capital murder of his wife, Kimberly

Petetan. The jury rejected, in a special issue, Appellant's claim that he

is intellectually disabled and therefore categorically ineligible for the death

penalty.[1]  And the jury answered the statutory special issues in such a manner that Appellant was sentenced to death.  Appeal to this court is automatic. We affirmed.[2]  Among the points of error we rejected were three relating to Appellant's claim that he is intellectually disabled:  that the jury's answer to the intellectual disability special issue was against the great weight and preponderance of the evidence (claim 10); that he is ineligible for the death penalty due to intellectual disability (claim 11); and that he was entitled to a pre-trial determination of his intellectual disability (claim 27).

At the time of our decision, Texas's standard for evaluating claims of intellectual disability was being reviewed by the United States Supreme Court in the case of another Texas capital offender, Bobby James Moore. In 2015, we had held that Moore was not intellectually disabled and

---

[1] The United States Supreme Court first used the term "mentally retarded" and its variants when it first recognized the Eight Amendment limitation on executing criminal defendants diagnosed with intellectual disability disorder. *Atkins v. Virginia*, 536 U.S. 304, 306 (2002).  The Court later announced that it would use the term "intellectual disability" to replace the term "mental retardation" because that was the terminology used in the Diagnostic and Statistical Manual of Mental Disorders. *Hall v. Florida,* 572 U.S. 701, 704 (2014).  The fifth edition of the Diagnostic and Statistical Manual on Mental Disorders recognizes that this terminology is interchangeable with the more precise term for the disorder, "intellectual developmental disorder."  American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* at 33 (5th ed. 2013)  ("DSM–5").  This opinion refers to the phrase "intellectual disability" and its variants even when referring to precedent using the phrase "mental retardation" and its variants for the sake of consistency.

[2] *Petetan v. State*, ___ S.W.3d ___, 2017 WL 915530 (Tex. Crim. App. Mar. 8, 2017).

consequently was eligible for the death penalty.[3] The question before the Supreme Court was whether Texas's legal standard for determining intellectual disability violated the Eighth Amendment's prohibition against the execution of intellectually disabled people.[4] Before we issued our mandate in the instant case, the Supreme Court decided that it did.[5]

We granted rehearing in this case on our own motion to consider Appellant's tenth, eleventh, and twenty-seventh claims in light of *Moore*. We substitute this opinion on rehearing for our resolution of those three issues, but leave the resolution of the other issues in the original opinion intact. Here, we again reject the claim that Appellant was entitled to a pre-trial determination of his intellectual disability. Concerning the sufficiency of the evidence regarding the jury's rejection of his intellectual disability claims, we apply contemporary clinical standards—the framework set forth in the DSM–5[6]—for assessing intellectual disability. We hold that, although legally sufficient, the evidence was factually

---

[3] *Ex parte Moore*, 470 S.W.3d 481, 527–28 (Tex. Crim. App. 2015) ("*Ex parte Moore I*").

[4] *Moore v. Texas*, 137 S. Ct. 1039, 1044 (2017) ("*Moore I*").

[5] *Id*.

[6] American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).

insufficient to support the jury's rejection of the intellectual disability special issue. Appellant is therefore entitled to a new punishment hearing. Accordingly, we vacate Appellant's death sentence and remand this cause for a new punishment hearing.

## Background

The United State Supreme Court has held that executing a defendant diagnosed with intellectual developmental disorder violates the Eighth Amendment. When the State seeks the death penalty, a criminal defendant wanting to raise this issue must prove, by a preponderance of the evidence, that he is intellectually disabled.[7] He must prove that he has subaverage intellectual functioning, and significant limitations in adaptive skills such as communication, self-care, and self-direction—both manifest before age eighteen.[8]

Relevant to these criteria, the jury heard evidence at the

---

[7] *Franklin v. State*, 579 S.W.3d 382, 386 (Tex. Crim. App. 2019) (the issue of intellectual disability is like an affirmative defense; the defendant has the burden to prove it by a preponderance of the evidence, whether the issue is raised at trial or on habeas).

[8] *Hall*, 572 U.S. at 710 ("the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period"); *Atkins*, 536 U.S. at 318 ("clinical definitions of [intellectual disability] require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18").

punishment phase of Appellant's trial that all of Appellant's IQ scores, adjusted for the standard error of measurement, fell in the "significantly subaverage intellectual functioning" category, and that several experts had diagnosed Appellant with intellectual disability. First, the Texas Juvenile Justice Commission records showed that, in February of 1991, at age fifteen, Appellant was administered a child IQ test. The test yielded a full-scale IQ score of 61. It also yielded a verbal IQ score of 67 and a performance IQ score of 61.

Second, in November 1991, psychiatrist Dr. Harold Scott examined Appellant as he entered a juvenile justice facility. As a result of the examination and previous test scores, Dr. Scott diagnosed Appellant as having "mild [intellectual disability] versus borderline intellectual functioning." The phrase "versus borderline intellectual functioning" was a hedge on the intellectual diagnosis because Appellant's passive-aggressive nature and his stubbornness undermined the usefulness of the clinical interview as a measure of intellectual ability. Dr. Scott also diagnosed Appellant as having conduct disorder.

Third, psychologist Dr. Ray Coxe administered intelligence and achievement tests to Appellant at age sixteen in April 1992. This testing was for the Jefferson County Juvenile Probation Office. The intelligence

tests for both children and adults were qualified for sixteen-year-olds, and Appellant took both tests. Appellant's full-scale IQ score on the child test was 64 and on the adult test was 74. Dr. Coxe testified that the first test—where he had doubts about whether Appellant was putting forth his full effort—was the child test, which yielded the lower IQ score. Dr. Coxe felt that the second test, the adult test that yielded an IQ score of 74, was a reliable indicator of Appellant's functioning. Nevertheless, Dr. Coxe testified that his "overall impression," based on the results of testing and on observations during interviews, was that Appellant "was mildly [intellectually disabled]." He also diagnosed him with "undersocialized aggressive conduct disorder."

Fourth, an IQ test was given to Appellant when he entered the adult prison system. Travis Turner, the Vice Chairman of Classification in the Texas Department of Criminal Justice, testified that an offender is given an initial IQ test upon entry. If the offender scores below a certain cutoff, then a "secondary test"—involving adaptive behavior screening—is given to determine whether the offender should be assigned to the "developmentally disabled" program in the Hodge Unit. Appellant's score on the IQ test was 69, so he was given the secondary test. There was no evidence of the results of that test. But Appellant was not assigned to

the program; he was assigned to the prison's regular facilities.

Fifth, in 2012, IQ testing was done as part of a Social Security disability assessment. Appellant, by then age thirty-six, was administered the WAIS–III IQ test, which yielded a full-scale IQ score of 55. The psychologist who conducted the test, Dr. Mark Correia, did not testify at trial, but his report was admitted into evidence. Dr. Correia diagnosed Appellant as having mild intellectual disability and antisocial personality disorder. The "mild [intellectual disability]" diagnosis was provisional "due to lack of supportive documentation from the developmental period."

Sixth, neuropsychologist Dr. Joan Mayfield conducted IQ tests and other testing at the request of the defense. She administered the WAIS–IV IQ test and obtained a full scale IQ of 52. In light of all her testing, Dr. Mayfield concluded that Appellant "presents with global delays, global delays in intellectual ability and academic and attention and executive functioning and problem solving, memory, language, motor, and visual perception. There was global delays across all domains."

And seventh, psychologist  Dr. Ellis Craig conducted an evaluation at the request of the defense to determine whether Appellant had adaptive deficits. He used the Adaptive Behavior Assessment System II

(ABAS–II), which uses people who know the subject (called "informants") to assess the subject's adaptive behavior in a number of areas. Dr. Craig conducted a "retrospective" screening, using reporting from family members. Dr. Craig concluded that the adaptive assessment scores fell within the range for moderate intellectual disability.

As defense counsel pointed out to the jury in closing, the State did not put on an opposing expert to say that Appellant was not intellectually disabled. The jury considered all the evidence related to Appellant's claim of intellectual disability and rejected it. The jury also found against Appellant on the mitigation special issue.

## I. The Evolution of the Legal Framework for Determining Intellectual Disability

### A. Atkins

In *Atkins v. Virginia*, the Supreme Court held that the Eighth Amendment bars the execution of intellectually disabled offenders.[9] The Court stated that those intellectually disabled persons "who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes."[10] But a death sentence is not a suitable

---

[9] *Atkins v. Virginia*, 536 U.S. 304 (2002).

[10] *Id*. at 306.

punishment for an intellectually disabled criminal because the diminished capacity of the intellectually disabled criminal lessens his moral culpability.[11]

The Court noted that clinical definitions of intellectual disability "require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18."[12]  But the Court recognized that "[n]ot all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus" regarding diminished moral culpability.[13]  It otherwise left to the States the task of developing appropriate ways to enforce this constitutional restriction.[14]

**B.**  ***Hall***

Later, in *Hall v. Florida*, the Court established rules, based on clinical standards, for interpreting IQ scores.[15]  Clinical definitions for intellectual

---

[11] *Id.*

[12] *Id*. at 318.

[13] *Id.* at 317.

[14] *Id*.

[15] *Hall v. Florida*, 572 U.S. 701 (2014).

disability, by their express terms, reject a strict IQ test score cutoff at 70 and include the standard error of measurement ("SEM").[16]  The SEM is "a statistical fact, a reflection of the inherent imprecision of the test itself."[17]  For purposes of most IQ tests, this imprecision in the testing instrument means that an individual's score is best understood as a range of scores on either side of the recorded score within which one may say an individual's true IQ score lies.[18]

Florida, however, had a law that, as interpreted, defined intellectual disability to require an IQ test score of 70 or less and failed to take into account the SEM.[19]  The Court held that Florida's 70-point threshold disregarded established medical practice in two interrelated ways: (1) it took an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts would consider other evidence; and (2) it relied on a purportedly scientific measurement of a defendant's abilities, his IQ score, while refusing to recognize that measurement's

---

[16] *Id*. at 712–13, 719.

[17] *Id*. at 713.

[18] *Id*.

[19] *Id.* at 711–12.

inherent imprecision.[20]  The Court held that Florida's strict IQ cutoff was unconstitutional because it created an unacceptable risk that persons with intellectual disability will be executed.[21]

After *Hall*, a State cannot refuse to consider other evidence of intellectual disability when a defendant's IQ score is close to, but above, 70.[22]  Though *Hall* reiterated that the legal determination of intellectual disability is distinct from a medical diagnosis, it also emphasized that the legal determination is informed by the medical community's diagnostic framework.[23]

## C.    *Ex parte Moore I* and *Ex parte Moore II*

The following year, in *Ex parte Moore I*, we held that Moore's IQ scores of 78 and 74 failed to establish by a preponderance of the evidence that he had significantly sub-average general intellectual functioning.[24]  Even though Moore had not established that criterion for

---

[20] *Id*. at 712.

[21] *Id*. at 704.

[22] *Id.* at 723 ("[W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.").

[23] *Id*. at 721.

[24] *Ex Parte Moore I*, 470 S.W.3d at 514.

intellectual disability, we went on to consider adaptive functioning.[25] We held that Moore had not proven by a preponderance of the evidence that he had significant and related limitations in adaptive functioning.[26] We noted some of Moore's adaptive strengths, such as the fact that he survived on the streets, mowed lawns, and played pool for money.[27] We further stated that the record showed that Moore's academic difficulties were caused by a variety of factors—including trauma from the emotionally and physically abusive atmosphere in which he was raised and undiagnosed learning disorders—rather than by significantly sub-average general intellectual functioning.[28] We concluded that Moore had not shown that his adaptive deficits were related to significantly sub-average general intellectual functioning."[29]

But we also relied upon our own case, *Ex parte Briseno*,[30] to support this conclusion.[31] We said that the *Briseno* factors weighed heavily

---

[25] *Id.* at 520.

[26] *Id*.

[27] *Id.* at 522.

[28] *Id*. at 488, 526.

[29] *Id*. at 488, 526.

[30] *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).

[31] *Ex parte Moore I*, 470 S.W.3d at 526–27.

against a finding that Moore's adaptive deficits were related to significantly sub-average general intellectual functioning.[32] We then rejected Moore's claim of intellectual disability.[33]

The Supreme Court granted certiorari. The Supreme Court held in part that our conclusion regarding Moore's IQ scores was irreconcilable with *Hall*.[34] The Court stated that our consideration of factors unique to Moore in disregarding the lower end of the SEM was contrary to clinical standards.[35] According to clinicians, the presence of other sources of imprecision in administering the test to a particular individual cannot narrow the test-specific standard-error range.[36] Because the lower end of Moore's score range fell at or below 70, we had to move on to consider Moore's adaptive functioning.[37]

The Court also found fault with our adaptive-deficit conclusion.[38] First, the Court held that our reliance on Moore's perceived adaptive

---

[32] *Id*.

[33] *Id.* at 527–28.

[34] *Moore I*, 137 S. Ct. at 1049.

[35] *Id.* at 1049–50.

[36] *Id.* at 1049.

[37] *Id*.

[38] *Id.* at 1050.

strengths was erroneous.[39]  The proper inquiry, according to clinicians, should be on Moore's deficits, like his lack of a basic understanding of time, seasons, the standards of measure, basic math, and his limited ability to read and write.[40]  The Court also chastised our reliance on Moore's behavior in prison to support a finding of adaptive strengths.[41]  According to the Court, this was inappropriate because clinicians caution against reliance on adaptive strengths developed in a controlled setting, like a prison.[42]

Suspect, too, was our finding of record support that Moore's academic difficulties were caused by a variety of factors rather than significantly sub-average general intellectual functioning.[43]  According to the Supreme Court, clinicians rely on such traumatic experiences as cause to explore the prospect of intellectual disability further, rather than to counter the case for a disability determination.[44]

The Court also said that we departed from clinical practice by

---

[39] *Id.*

[40] *Id*.

[41] *Id.*

[42] *Id*.

[43] *Id*. at 1051.

[44] *Id*.

requiring Moore to show that his adaptive deficits were not related to "a personality disorder."[45]  Again, according to clinicians, the existence of a personality disorder or mental-health issue is "'not evidence that a person does not also have intellectual disability'"; many intellectually disabled people also have other mental or physical impairments.[46]

Finally, the Court held that our attachment to the seven *Briseno* evidentiary factors "further impeded" our assessment of Moore's adaptive functioning.[47]  The Court criticized the use of these factors both because they had no grounding in prevailing medical practice and because they invited "lay perceptions of intellectual disability" and "lay stereotypes" to guide assessment of intellectual disability.[48]  Emphasizing the *Briseno* factors over clinical factors, the Court said, creates an unacceptable risk that persons with intellectual disability will be executed.[49]  To sum up, the Court held that we, contrary to clinical practice: overemphasized Moore's perceived adaptive strengths; stressed Moore's improved behavior in

---

[45] *Id.*

[46] *Id*. (quoting Brief for American Psychological Association, APA, et al. as Amici Curiae 19).

[47] *Id*.

[48] *Id*. at 1052.

[49] *Id.* at 1051.

prison; concluded that Moore's record of traumatic experiences detracted from a determination that his intellectual and adaptive deficits were related; required Moore to show that his adaptive deficits were not related to a personality disorder; and considered the *Briseno* factors. The Court vacated our judgment and remanded the case for further proceedings not inconsistent with the opinion.[50]

On remand, we adopted the contemporary clinical standards set forth in the DSM–5 for assessing intellectual disability.[51] We applied those standards and once again determined that Moore was not intellectually disabled.[52] Given that determination, we held that Moore was eligible for the death penalty.[53]

The Supreme Court granted certiorari and summarily reversed.[54] The Supreme Court emphasized that, while *Atkins* and *Hall* left to the States the task of developing appropriate ways to enforce the restriction on executing intellectually disabled people, a court's intellectual disability

---

[50] *Id.* at 1053.

[51] *Ex parte Moore*, 548 S.W.3d 552, 560 (Tex. Crim. App. 2018) ("*Ex parte Moore II*").

[52] *Id*. at 573.

[53] *Id.*

[54] *Moore v. Texas*, 139 S. Ct. 666 (2019) (per curiam) ("*Moore II*").

determination must be informed by the medical community's diagnostic framework.[55]  According to the Court, we had again run afoul of the medical community's diagnostic framework.  This Court had: "relied less upon the adaptive *deficits* to which the trial court had referred than upon Moore's apparent adaptive *strengths*"; "relied heavily upon adaptive improvements made in prison"; "concluded that Moore failed to show that the 'cause of [his] deficient social behavior was related to any deficits in general mental abilities' rather than 'emotional problems'"; and "used many of [the Briseno] factors in reaching its conclusion."[56]  The Court concluded that our opinion rested upon analysis too much of which too closely resembled what it had previously found improper.[57]  Given that, the Court held that Moore had shown he is a person with intellectual disability.[58]

### D.    The DSM–5, AAIDD-11, and "Relatedness"

---

[55] *Id.* at 669.

[56] *Id*. at 670–71.

[57] *Id.* at 672.

[58] *Id*. at 672.  The Supreme Court reversed and remanded.  And we reformed Moore's sentence to life.  *Ex parte Moore*, 587 S.W.3d 787, 788–89 (Tex. Crim. App. 2019) ("Having concluded that Applicant is a person with intellectual disability that is exempt from the death penalty, the Supreme Court has resolved Applicant's claim in his favor. There is nothing left for us to do but to implement the Supreme Court's holding. Accordingly, we reform Applicant's sentence of death to a sentence of life imprisonment.").

The Supreme Court's evolving jurisprudence after *Atkins* leaves one small question open; must a defendant show that adaptive deficits are "related" to sub-average intellectual functioning?  In *Atkins*, the United States Supreme Court mentioned two sources for determining intellectual disability, one from the American Psychiatric Association (APA) and the other from the American Association on Mental Retardation (now the AAIDD).[59]  Both pointed to the same three accepted diagnostic criteria (sub-average intellectual functioning, adaptive deficits, and onset prior to age eighteen), and both added the requirement that adaptive deficits must be related to sub-average intellectual functioning.  But the AAIDD has since dropped that requirement, while the APA has not.[60]

The APA and the AAIDD seem to approach their respective manuals from slightly different perspectives.  The APA has designed the DSM-5 primarily as an aid to clinicians; the drafters sought a common

---

[59] *Atkins*, 526 U.S. at 308 n.3.  At the time, the APA derived its definition and diagnostic criteria for intellectual disability from the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders.  The definition and diagnostic criteria has not changed from the fourth to the fifth edition.  Compare DSM-4 at 42–43 with DSM-5 at 37–38.  The American Association on Mental Retardation derived its definition and diagnostic criteria for intellectual disability from the ninth edition of its diagnostic manual, "Mental Retardation: Definition, Classification, and Systems of Supports 5."  After *Atkins*, The American Association on Mental Retardation changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD).  AAIDD currently derives its definition and diagnostic criteria for intellectual disability from the eleventh edition of that diagnostic manual.  The current edition of the AAIDD diagnostic manual omits the "relatedness" requirement.

[60] *See* note 59.

terminology that would apply to a wide range of disciplines, including the law.[61] The DSM recognizes that its diagnostic criteria are guidelines for use by clinicians, and acknowledges the need for caution when using them in forensic settings. It specifically notes the risk of misuse attendant to relying upon the DSM-5's categories, criteria, and textual descriptions in a forensic setting.[62] Nevertheless, this caution underlies that the manual has been drafted with the understanding that it will be used as a reference for courts and attorneys as well as clinicians.[63]

In contrast, the AAIDD takes a more forward-looking view. According to the AAIDD-11, "the concept of intellectual disability (ID) belongs within the general construct of disability that has evolved over the last 3 decades to emphasize an ecological perspective that focuses on the interaction of the person with his or her environment and the recognition that the systemic application of individualized supports can

---

[61] DSM-5 at xii ("Although this edition of DSM was designed first and foremost to be a useful guide in clinical practice, as an official nomenclature it must be applicable to a wide diversity of context.").

[62] DSM-5 at 25 ("When DSM-5 categories, criteria, and textual descriptions are employed for forensic purposes, there is a risk that diagnostic information will be misused or misunderstood.").

[63] *Id*. ("Although the DSM-5 diagnostic criteria and text are primarily designed to assist clinicians in conducting clinical assessment, case formulation, and treatment planning, DSM-5 is also used as a reference for the courts and attorneys in assessing the forensic consequences of mental disorders.").

enhance human functioning."[64]   Further, the AAIDD does not regard intellectual disability as a character trait.[65]   Instead, it sees intellectual disability as exemplifying the interaction between the person and his or her environment.  The focus is on the role that individualized supports can play in enhancing human functioning and allowing for the pursuit and understanding of the principles inherent within the disability movement.[66] According to the AAIDD-11, "an important purpose of describing limitations is to develop a profile of needed supports."[67]

The approach taken in each manual highlights the inherent tension between the clinical perspective attendant to a diagnosis of intellectual development disorder and the legal determination of moral blameworthiness.[68]   At its core, *Atkins* seems to rest its justification for a death-penalty exemption on the assumption that intellectual disability is a character trait that lessens moral culpability and so the retributive

---

[64] AAIDD at xiii.

[65] *Id.*

[66] *Id.*

[67] *Id*. at 1.

[68] *See, e.g.*, *Kansas v. Crane*, 534 U.S. 407, 413 (2002) (noting that "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law"); *Hall*, 572 U.S. at 721 ("It is the Court's duty to interpret the Constitution, but it need not do so in isolation. The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework.").

value of the punishment. But the clinical criteria for diagnosing someone with intellectual development disorder seems to look forward to how the diagnosis can better assist the individual function in society without regard to any consideration of moral blameworthiness. And, as in the case with the AAIDD-11, there is an affirmative rejection of any character-based assessment.

Nevertheless, the Supreme Court held that states are to focus on whether a capital murder defendant falls within that category of intellectual developmental disorder that limits his moral blameworthiness—the original justification for the categorical exemption.[69] To the extent that the clinical diagnosis of intellectual developmental disorder can be harmonized with a reviewing court's legal inquiry under *Atkins* and its progeny, the approach taken by the DSM-5 hews closer to the original justification set out by the Supreme Court than the AAIDD-11. And that is the approach we take.

This is not to suggest that a court or jury should reject an expert's testimony simply because the expert's diagnosis was informed by the

---

[69] *Atkins*, 536 U.S. at 306 ("Those [intellectually disabled] persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct.").

AAIDD-11. Such an approach would be antithetical to the caution urged by the drafters of the DSM-5 when considering the use of the manual in a forensic setting. As mentioned above, the criteria for diagnosing an individual with intellectual developmental disorder are largely the same in both diagnostic manuals. Nothing in this opinion should be construed as prohibiting consideration of or reliance upon the AAIDD-11. We only recognize that there must be a showing that adaptive deficits are related to subaverage intellectual functioning to satisfy the *Atkins* exception to the imposition of the death penalty.

Neither do we suggest that this "relatedness" inquiry is unlimited. The Supreme Court did clarify in *Moore I* that relatedness cannot be a backdoor for reliance upon lay stereotypes or evidence of adaptive strengths to undermine an otherwise clinical diagnosis.[70] Similarly, the Supreme Court faulted this Court for requiring proof that adaptive deficits are not related to "a personality disorder" because many intellectually disabled people have other mental or physical impairments.[71] So while the relational requirement found in the DSM-5 is currently a necessary legal requirement under *Atkins*, it is not a vehicle to undermine an

---

[70] *Moore I*, 137 at 1051.

[71] *Id*.

otherwise clinical diagnosis through consideration of lay stereotypes, adaptive strengths, and alternative disorders.

Under the DSM–5, the following three criteria must be met for a person to be considered intellectually disabled: (A) deficits in intellectual functions; (B) deficits in adaptive functioning that are directly related to the intellectual impairments; and (C) the onset of these intellectual and adaptive deficits during childhood or adolescence.[72]  We will address criterion one and criterion two in turn.  We do not address criterion three because it is not in dispute.  With that background in mind, and now with the benefit of both *Moore* decisions, we revisit our resolution of Appellant's intellectual disability claims in this case.

## II.   The Constitution Does Not Require a Pre-trial Determination of Intellectual Disability

On original submission, Appellant argued that the trial court erred in denying his motion for a pretrial determination of intellectual disability. At that time, the Legislature had not enacted legislation on this topic. This remains the case today.[73]  We concluded that "the issue of

---

[72] DSM-5 at 33; *see* AAIDD–11.  As Chief Justice Roberts noted in his dissent in *Moore*, "Keeping the relatedness requirement would be inconsistent with the AAIDD's current guidance; dropping it would be out of step with the newest version of the DSM."  *Moore*, 137 S. Ct. at 1055 (Roberts, C.J., dissenting).

[73] *See* Tex. HB 1139, 86th Leg., R.S. (2019). The bill, filed by State Rep. Senfronia Thompson, D-Houston, would have provided, among other things, that in the face of evidence

[intellectual disability] may not be litigated pretrial."[74] We reasoned that:

> At any pretrial determination of [intellectual disability], the State would have to marshal "all of its evidence" of the defendant's guilt of the offense and his role in the offense in order for the factfinder to be able to assess how that evidence might weigh into resolving the issue. That has to occur because the defendant's conduct in connection with the offense is relevant to determining whether he is [intellectually disabled]. Moreover, nearly all of the State's punishment evidence would be relevant as well. For example, extraneous offenses not explored at the guilt phase could shed as much light on a defendant's mental abilities as the offense for which he is on trial. [Intellectual disability] "is a sentencing issue," and litigating such an issue before a finding of guilt "puts the cart before the horse and results in an advisory opinion."[75]

On rehearing, Appellant argues that *Moore* undercuts our conclusion on

---

from a credible source indicating that a capital defendant is a person with an intellectual disability and a timely request, "the judge shall hold a hearing to determine the issue not later than the 120th day before the date the trial is scheduled to begin." As was reported in the Texas Tribune on May 26, 2019:

> As the bill moved through the Senate, however, it was largely gutted, instead only stating that a defendant who has an intellectual disability can't receive the death penalty and such determinations must be made using current medical standards. That language would have codified existing U.S. Supreme Court rulings but offered no direction on how to follow them.
>
> Earlier this week, when the bill came back from the Senate amended, Thompson requested a conference committee in which members from both chambers could iron out the differences between the two versions. The committees had until midnight Sunday to file a report with a compromise version. The deadline passed without a report.

Elizabeth Byrne and Jolie Mccullough, *Despite bipartisan support, Texas bill tackling intellectual disability in death penalty cases fails*, Texas Tribune, May 26, 2019, https://www.texastribune.org/2019/05/26/Texas-death-penalty-intellectual-disability-fails/.

[74] *Petetan,* 2017 WL 915530, at *46.

[75] *Id.,* at *45.

original submission.[76]  We disagree.

*Atkins* and its progeny did not hold that an intellectual-disability determination was something other than a sentencing issue, and they do not require a pretrial determination.  Nor do the cases (in spite of the Court's rejection of the *Briseno* factors)[77] say details of the offense can't be considered at all; rather, the cases just state that the focus should be on adaptive deficits and that adaptive strengths should not be overemphasized.[78]  And, given the relational requirement under the DSM–5, consideration of the details of the offense (and extraneous offenses) may be necessary when evaluating the strength and reliability of an expert's opinion regarding intellectual disability.  This is true even if the details do not provide an independent basis for determining the

---

[76] Appellant's Br. 52.

[77] *Briseno*, 135 S.W.3d, at 8–9 ("Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?").  *See* Brief for AAIDD et al. as Amici Curiae 14–15, and n.23 ("AAIDD has specifically disapproved of using the facts of the crime in the diagnostic process."  AAIDD, Manual 2010, *supra* note 3, at 102; American Association on Intellectual and Developmental Disabilities, User's Guide: To Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports 20 (2012) ("Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior. . . . The diagnosis of ID is not based on the person's 'street smarts,' behavior in jail or prison, or 'criminal adaptive functioning.'")).  But again, the jury is not diagnosing intellectual disability. It is determining whether Appellant fits in the class of "less morally culpable." *Ex parte Butler*, 416 S.W.3d 863, 870–71, 875 & n.51  (Tex. Crim. App. 2012) (per curiam) ("while clinicians might not use such behaviors in their diagnostic analysis, factfinders in the judicial system are not precluded from doing so") (Cochran, J., concurring).

[78] *See, e.g.*, *Moore I*, 137 S. Ct. at 1059.

existence of an intellectual disability.[79]   Therefore, under existing Supreme Court case law, and in light of the lack of state legislation, we re-affirm our holding that intellectual disability is a sentencing issue.  And sentencing issues are generally not ripe for review before a finding of guilt.

Indeed, Texas courts are not empowered to give advisory opinions—a prohibition that extends to cases that are not ripe for review.[80]  An issue is ripe when "the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.' . . . Thus, the ripeness analysis focuses on whether a case involves uncertain or contingent future events that may not occur as anticipated or may not occur at all."[81]

For example, in *State ex rel. Watkins v. Creuzot*, the defendant filed

---

[79] DSM-5 at 38 ("To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A.").

[80] *Patterson v. Planned Parenthood of Hous. and Se. Tex., Inc.*, 971 S.W.2d 439, 443 (Tex.  1998).

[81] *Patel v. Tex. Dep't of Licensing and Regulation*, 469 S.W.3d 69, 78 (Tex. 2015) (quoting *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851–52 (Tex. 2000)); *see In re Allen*, 462 S.W.3d 47, 67 (Tex. Crim. App. 2015) (Newell, J., dissenting) ("'At the time a lawsuit is filed, ripeness asks whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote.'") (quoting *Patterson*, 971 S.W.2d at 442).

a motion to preclude the death penalty in his retrial.[82] He argued that the lengthy delay in obtaining post-conviction relief had rendered certain mitigation evidence unavailable.[83] After several evidentiary hearings, the trial judge granted the motion.[84] The State filed a petition for a writ of mandamus and prohibition to require the trial judge to vacate this order.[85] We concluded that the trial judge did not have the legal authority to preclude the State from seeking the death penalty and therefore conditionally granted mandamus relief.[86]

In support of that conclusion, we stated that the adequacy of the defendant's mitigation case was not yet ripe for review.[87] We explained:

> We do not put the cart before the horse: "a defendant has no claim of wrongful conviction or wrongful sentencing before he has even gone to trial." The adequacy and efficacy of [the defendant's] mitigation case cannot be judged unless he has actually been convicted of capital murder and sentenced to death. Any pretrial determination of that mitigation case is necessarily hypothetical and unlikely to fairly reflect reality as

---

[82] *State ex rel. Watkins v. Creuzot*, 352 S.W.3d 493, 494–95 (Tex. Crim. App. 2011).

[83] *Id.* at 498.

[84] *Id.*

[85] *Id.* at 494.

[86] *Id.* at 506.

[87] *Id.* at 504.

it plays out in an actual trial.[88]

That reasoning in *Creuzot* applies equally here. The injury Appellant complains about is imposing a death sentence on an intellectually disabled defendant in violation of the Eighth Amendment. But pretrial, that injury involves "uncertain or contingent future events that . . . may not occur at all."[89] Imposing a death sentence first requires a finding of guilt—something that, before trial, is "uncertain." Holding a hearing on intellectual disability prior to a finding of guilt puts the cart before the horse and results in an advisory opinion. More simply, a claim of intellectual disability is not yet ripe for review.

Appellant argues that we should look at other states' practices when determining this issue. Appellant asserts that, out of the states that have capital punishment, a majority of them either provide for or mandate a pretrial determination.[90] While that may be true, *Atkins* and its progeny do not require it. Neither does Texas law.

Appellant also argues that an intellectual-disability determination is a threshold question that must be determined apart from the merits of

---

[88] *Id.* at 505.

[89] *Patel*, 469 S.W.3d at 78.

[90] Appellant's Br. 58.

the case itself.[91]   In support of that argument, Appellant likens an intellectual-disability determination to determinations of a defendant's incompetency or juvenile status—both of which are determined pretrial.[92] Regarding incompetency, he relies on *Ex parte Hagans*, in which we stated: "[W]here there is evidence to support a finding of incompetency to stand trial, a jury shall be impaneled, separate from the jury selected to determine guilt or innocence of the defendant, to determine the defendant's competency to stand trial."[93]   This requirement ensures that "an accused's competency can be made 'uncluttered by evidence of the offense itself.'"[94]

Appellant, however, overlooks the right protected by that requirement: "The *conviction* of an accused while he is legally incompetent to assist in his own defense violates fundamental interests of due process."[95]   It is the conviction itself that violates an incompetent defendant's constitutional rights.   This makes a pretrial incompetency

---

[91] *Id.* at 60–61.

[92] *Id.* at 63–67.

[93] *Ex parte Hagans*, 558 S.W.2d 457, 461 (Tex. Crim. App. 1977).

[94] *Id.*

[95] *Id.* (emphasis added).

determination ripe for review. But with intellectual disability, it is not the conviction we are concerned with—it is the punishment.[96] And we do not reach the issue of punishment without a conviction. Therefore, the rationale for requiring incompetency determinations pretrial is not applicable to intellectual-disability determinations.

Finally, Appellant likens the categorical exemption from the death penalty for people with intellectual disability to the categorical exception from the death penalty for juveniles. According to Appellant, "the constitutional underpinnings of the categorical exemption for persons with intellectual disability are exactly the same as the categorical exemption for juveniles."[97] Therefore, in Appellant's view, "the procedure for determining intellectual disability should be 'no different from conducting a pretrial determination of whether the defendant was a juvenile at the time of the offense.'"[98] Though we agree that the categorical exemption from the death penalty for juveniles developed from the categorical exemption for intellectually disabled individuals, we disagree that there

---

[96] *Cf. Atkins*, 536 U.S. at 306 ("Those [intellectually disabled] persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes.").

[97] Appellant's Br. 63.

[98] *Id.* (quoting *In re Allen*, 462 S.W.3d at 54 (Meyers, J., concurring)).

is no difference in the procedures for juvenile offenders and adult offenders.

For a juvenile to be tried as an adult for capital murder, the juvenile must first be transferred from the juvenile system to the district court.[99] For the juvenile system to have jurisdiction to transfer the case, the defendant must have been a juvenile (under the age of 17) when the offense was committed.[100] Therefore, the defendant's age must necessarily be determined at that time, making it ripe for review. And, unlike intellectual-disability determinations, the defendant's age is usually readily ascertainable and not subject to reasonable dispute and does not depend on the facts of the offense or other evidence relating to punishment such as the defendant's dangerousness and moral culpability. Thus, the rationale for requiring juvenile-status determinations prior to trial is not applicable to intellectual-disability determinations.

Lastly, Appellant asserts that a pretrial determination "is plainly in the interest of judicial economy."[101] This may well be true. But "[p]ublic-policy arguments quickly pile up on both sides of the debate on

---

[99] *Moon v. State*, 451 S.W.3d 28, 37–38 (Tex. Crim. App. 2014).

[100] *See* TEX. FAM. CODE § 51.04.

[101] Appellant's Br. 67.

when and by whom intellectual-disability determinations should be made;

. . . [T]hey find utility only in the Legislature and should be directed

there."[102]  And our Legislature punted on that issue (again) when it last

considered it.

We therefore conclude that *Atkins* and its progeny do not require a

pre-trial determination of intellectual disability as a matter of federal

constitutional law.  Because the pre-trial determination was neither

constitutionally nor statutorily required, the trial court did not err in

refusing to hold a pre-trial hearing on the issue of intellectual disability.

## III. The Evidence Was Legally Sufficient To Support The Jury's Adverse Finding on Intellectual Disability

### A.    Standard of Review

Intellectual disability is a punishment-mitigation issue that is in the

nature of an affirmative defense.  The defendant shoulders the burden of

proof to show intellectual disability by a preponderance of the evidence.[103]

Affirmative defenses may be evaluated for legal and factual sufficiency.[104]

In a legal-sufficiency review of an affirmative defense, reviewing

---

[102] *In re Allen*, 462 S.W.3d at 53.

[103] *Neal v. State*, 256 S.W.3d 264, 273 (Tex. Crim. App. 2008).

[104] *Matlock v. State*, 392 S.W.3d 662, 669–70 (Tex. Crim. App. 2013).

courts should first assay the record for a scintilla of evidence favorable to the factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not.[105] The finding of the factfinder rejecting a defendant's affirmative defense should be overturned for lack of legal sufficiency only if the appealing party establishes that the evidence conclusively proves his affirmative defense, and no reasonable factfinder was free to think otherwise.[106]

We are, as was noted in the original majority opinion, evaluating the jury's determination rather than independently considering whether Appellant is intellectually disabled.[107] Unlike in the habeas context, we are not the ultimate factfinder on direct appeal.[108] The issue of intellectual disability was litigated at trial before a jury, and on direct appeal from that trial, we exercise appellate-style deference to the determination made by the jury.[109] In the face of a record of historical

---

[105] *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015) (citing *Matlock*, 392 S.W.3d at 669–70).

[106] *Id. (citing Matlock*, 392 S.W.3d at 670).

[107] *Petetan*, 2017 WL 915530, at *6.

[108] *See Ex parte Owens*, 515 S.W.3d 891, 895 (Tex. Crim. App. 2017) (on habeas review, although the trial court is the "original" factfinder, the Court is the "ultimate fact-finder").

[109] *Neal*, 256 S.W.3d at 273.

facts that supports conflicting inferences, a reviewing court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the verdict, and must defer to that resolution.[110]

## B.    Analysis

### 1.    Criterion A: Intellectual Deficits

Criterion A—deficits in intellectual functioning—"refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding.    Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy."[111]  These functions are typically measured through individually administered tests of intelligence.[112]  A score "approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points)" indicates intellectual disability.[113]  For tests with a

---

[110] *See Jackson v. Virginia*, 443 U.S. 307, 326 (1979).

[111] DSM–5 at 37.

[112]  *Id.*  The tests must be psychometrically valid, comprehensive, culturally appropriate, and psychometrically sound.  *Id.*

[113] *Id.*; AAIDD–11 at 35.

mean of 100 and standard deviation of 15, this would be a score of 65 to 75 (70 ± 5).[114] Practice effects and the "Flynn effect,"[115] however, may affect test scores.[116]

Here, Appellant produced the following IQ test scores:

| Psychologist | Year | Score |
|---|---|---|
| Texas Juvenile Justice Commission | 1991 | 61 (Full scale)<br>67 (Verbal)<br>61 (Performance) |
| Dr. Ray Coxe | 1992 | Child<br>64 (Full scale)<br>Adult<br>74 (Full scale) |
| Texas Department of Criminal Justice | 1993 | 69 (Unclear) |
| Dr. Mark Correia | 2012 | 55 (Full scale) |
| Dr. Joan Mayfield | 2013 | 52 (Full scale)<br>54 (Verbal)<br>56 (Perceptual reasoning)<br>71 (Working memory)<br>52 (Processing speed) |

Dr. Coxe testified that the 1992 IQ test for adults that he administered to Appellant—resulting in a score of 74—had a standard

---

[114] DSM–5 at 37.

[115] The Flynn effect involves "overly high scores due to out-of-date test norms." *Id.*

[116] *Id.*

error measurement of three points, which could yield an IQ score as high as 77 or as low as 71. This means that one of the five test scores placed Appellant outside the range of someone with intellectual deficits. This alone, however, is insufficient to reject Appellant's intellectual-disability claim.[117] Four scores placed Appellant within the range of intellectual disability. And *Moore* requires courts to "continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits."[118]

There was also some evidence that Appellant may have been malingering on some of the tests.[119] But this alone is also insufficient to reject Appellant's intellectual-disability claim. Under *Moore*, "the

---

[117] *Moore I*, 137 S. Ct. at 1048 ("In *Hall v. Florida*, we held that a State cannot refuse to entertain other evidence of intellectual disability when a defendant has an IQ score above 70.").

[118] *Moore I*, 137 S. Ct. at 1050.

[119] Dr. Coxe testified that he had to administer both the child IQ test and the adult IQ test to Appellant because Appellant's attitude suggested that he was not putting forth his best efforts. Dr. Coxe further testified that, on some items and tests, Appellant "gave up very quickly without making too much of an effort" and had "a little bit of an attitude about the testing." Dr. Correia testified that Appellant "had little interest in the exam, requesting repeatedly to be allowed to leave to smoke a cigarette, use the restroom and take cell phone calls." Dr. Correia stated that Appellant seemed to "put forth an effort to cooperate minimally and superficially only." Dr. Mayfield testified that she administered both the Test of Memory Malingering ("TOMM") and the Rey 15 test to Appellant. The TOMM test placed Appellant in the category of "inadequate effort strongly suspected." Appellant was also below the cutoff for adequate effort on the Rey test. Dr. Mayfield, however, discounted these scores based on other research. She concluded that Appellant exerted good efforts on all the tests.

presence of other sources of imprecision in administering the test to a particular individual . . . cannot *narrow* the test-specific standard-error range."[120]  Therefore, we abandon our conclusion in the original opinion that the jury could have resolved Appellant's intellectual disability claim against him based solely upon his failure to show sub-average intelligence.  We next turn to the evidence regarding adaptive deficits.

### 2.    Criterion B: Adaptive Deficits

Criterion B—deficits in adaptive functioning—requires an evaluation of the individual's ability to function across a variety of dimensions.[121]  More specifically, it refers "to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background."[122]  This involves three domains of adaptive reasoning: conceptual, social, and practical.[123]

Criterion B is satisfied when at least one of those domains "is sufficiently impaired that ongoing support is needed in order for the

---

[120] *Moore I*, 137 S. Ct. at 1049.

[121] *Brumfield v. Cain*, 135 S. Ct. 2269, 2279 (2015).

[122] DSM–5 at 37.

[123] *Id.*

person to perform adequately in one or more life settings at school, at work, at home, or in the community."[124] Adaptive deficits are measured through clinical evaluations and testing, which must be culturally appropriate and psychometrically sound.[125] The tests should use standardized measures "with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible."[126] Additional informational sources "include educational, developmental, medical, and mental heath evaluations."[127] All of this information "must be interpreted using clinical judgment."[128]

### a. Evidence Overview

#### i. *Dr. Craig*

At the defense's request, psychologist Dr. Ellis Craig evaluated Appellant to determine whether he had adaptive deficits. Dr. Craig used the ABAS-II. He performed a retrospective assessment because

---

[124] *Id.* at 38.

[125] *Id.* at 37.

[126] *Id.*

[127] *Id.*

[128] *Id.*

Appellant was incarcerated at the time[129] and because no one had previously conducted a standardized adaptive behavior scale on Appellant.

Dr. Craig stated that the ABAS-II was not normed for retrospective assessment, elaborating that "[r]etrospective assessments are a specialized subset that I don't think any tests are normed to do." On cross-examination, the prosecutor went through the ABAS–II questionnaire and pointed to items that could be inappropriate for a 14 to 16 year old and for which Appellant was given the score of 1 (out of 0 to 3).[130] Dr. Craig was also asked what percentage of the population

---

[129] More specifically, Dr. Craig stated: "In this context, where it really becomes important is that you really have to do a retrospective assessment of adaptive behavior for somebody who is incarcerated. You simply cannot do an adaptive behavior assessment in a jail or prison setting."

[130] These items included:

- Calls to find out if a repair or order is ready.

- Calls a repair person if, for instance, the air conditioner or heater is not working.

- Takes people on trips to nearby places; for example, takes a child or family member to a park.

- Asks a store clerk for product information before buying an item.

- Reads and follows instruction to assemble new purchases.

- Makes reminder notes or lists.

- Completes forms for business or services; for example, obtains a lease.

aged 30 to 39 (for which the particular ABAS–II was normed) had been incarcerated for 20 years of their life.  Dr. Craig responded, "I would say zero," and he acknowledged that he could only work with the data he was given from the "informants."

The ABAS–II requires "informants," who are people that give information about the subject being assessed.  Dr. Craig stated that an "informant" is "somebody who knows the individual well, has seen them in a variety of situations and for a fairly extended period of time.  For that reason, it's typically family members."  Dr. Craig also testified that it is important to find informants that don't "have a vested interest in giving you incorrect information."

For Appellant's assessment, Dr. Craig used Appellant, his mother, an older brother, an older sister, and an uncle as "informants."  The scores from highest to lowest were: brother, 53; uncle, 47; sister, 47; Appellant, 42; mother, 40.  The norm for the population on the ABAS–II

---

- Reads important documents; for example, credit card applications or rental agreements.

- Balances a checkbook.

- Follows the maintenance schedule for home or car.

- Reserves tickets in advance for activities such as concerts or sports events.

is between 85 to 115, and the lowest possible score is 40.

Dr. Craig did not rely on Appellant's score "because there are some problems with self-reports." For example, Dr. Craig stated that studies show that intellectually disabled people "will try to . . . 'pass as normal,' and they will present themselves as more competent than they really are because they don't want to be put into that class." Dr. Craig also discounted the mother's assessment because she "was inconsistent in her responses."

All informants, except for the uncle, ranked Appellant's social skills the highest, his conceptual skills second, and his practical skills the lowest. Dr. Craig noted that the pattern of the uncle's responses was "very different" compared to the pattern of the other informants' responses. Dr. Craig "thought [the uncle] was a good informant and . . . had a very realistic picture of [Appellant]," but he opined that the pattern was different because the uncle "actually was not around [Appellant] that much" and had a different set of standards. Dr. Craig thought that the brother's and sister's "assessments were probably the most accurate and most reflective of what [Appellant's] actual day-to-day functional skills really are."

Dr. Craig stated that Appellant's "adaptive limitations far outweigh

his minimal skills." Dr. Craig testified, "[A]ppellant does have skill areas. There is no question," and stated, "What caused all this . . . is hard to say, but one likely explanation is that there were many missed opportunities to learn these skills."[131]  Based on his ABAS-II and the scores he had "seen on intelligence," Dr. Craig found Appellant "actually has—he would fall into the moderately [intellectually disabled] range."

ii.     *Other Witnesses and Evidence*

Three school officials, Dorothy Stamps, Morris Lee, and Eddie Fowler, testified generally about Appellant's behavior in school and his motivation.  Appellant's mother, Ophelia Ortiz, also testified and described Appellant overall as "slow," and said she had to give him more attention than her other children when he was growing up.  Other witnesses included Appellant's sister, Sabrina Mouton; Appellant's aunt, Cathy Gauthier; Appellant's cousin, Caston Gauthier; Appellant's Cousin, Kimberly Jackson; and Appellant's uncle, Thomas Kemper.  Overall, they characterized Appellant as slower than others.

Appellant's education records from kindergarten through ninth grade were introduced into evidence at trial.  Multiple letters from Appellant to

---

[131] Regarding "missed opportunities," Dr. Craig referenced the fact that Appellant spent the majority of his life incarcerated and, even when home, he did not receive adequate parental supervision.

Kimberly were also introduced at trial. Appellant testified at the guilt stage of trial. This testimony is set out in our original opinion. Appellant gave a somewhat incredible exculpatory account of the incidents that occurred on September 13 and 23, 2012. But his story was coherent, and he stuck with it consistently, even under attack by the prosecutor.

**b.     Conceptual Domain**

i.     *Appellant's Education Records–Conceptual Domain*

The trial record includes most of Appellant's academic records for kindergarten through ninth grade. For kindergarten through second grade, Appellant did not receive numerical grades. Instead, he received grades based on above average, average, below average, and level function. The record does not make clear what "level function" means. His grades, number of absences, and number of days present were as follows:

|  | **K** | **1st** | **2nd** |
|---|---|---|---|
| **Reading** | level function | below | below |
| **Arithmetic** | average | below | below |
| **Other Language Arts** | average | average | average |
| **Social Studies** | average | average | average |
| **Science** | average | average | average |

| Effort | average | average | average |
|---|---|---|---|
| **Citizenship** | average | below | below |
| **# of Absences** | 7 | 18 | 10 |
| **# of Days Present** | 136 | 154 | 165 |

From third through fifth grade, Appellant received both numerical grades and letter grades of "S," "N," and "U." Although the record does not make this clear, the designations "S," "N," and "U" appear to mean, respectively, "satisfactory," "needs improvement," and "unsatisfactory." Appellant was "retained" in third grade, meaning he was required to repeat that grade. The following are Appellant's grades, number of absences, and number of days present from both times he went through third grade, along with fourth and fifth grade:

|  | 3rd | 3rd | 4th | 5th |
|---|---|---|---|---|
| **Reading** | 54 | 63 | 72 | 75 |
| **Language** | 45 | 43 | 64 | 76 |
| **Spelling** | 40 | 53 | 62 | 76 |
| **Handwriting** | 71 | S | S | S |
| **Math** | 37 | 63 | 74 | 75 |
| **Social Studies** | 78 | 60 | 70 | 75 |
| **Science** | 80 | 51 | 72 | 75 |
| **Health** | 79 | N | S | S |

| Art | 79 | S | S+ | S |
|---|---|---|---|---|
| **Music / Band** | 74 | N | N | N |
| **P.E.** | 85 | N | N | S |
| **Personal Growth** | U | U | N | N |
| **# of Absences** | 29 | 7 | 30 | 8 |
| **# of Days Present** | 146 | 168 | 145 | 167 |

The records also include the scores from multiple standardized tests that he took between third and fifth grade. During his first time in third grade, Appellant took the Texas Assessment of Basic Skills ("TABS") on math, reading, and writing. Overall, Appellant passed only five of the twenty-three objectives.[132] Six months into the school year, he took the California Achievement Test ("CAT") on reading, language, and math. He scored lower than 90% of the other students and tested at the level of a student four months into second grade.

During his second time in third grade, Appellant took the Texas Educational Assessment of Minimum Skills ("TEAMS") in math, reading, and writing. He passed the reading section but not the math and writing sections. Six months into the school year, he took the CAT. He scored lower than 81% of the other students and tested at the level of a student

---

[132] The writing section had five objectives of which Appellant passed one and failed four. The reading section had eight objectives of which Appellant passed three and failed five. The math section had ten objectives of which Appellant passed one and failed nine.

seven months into second grade.  Appellant was "socially promoted" to the fourth grade even though his grades were failing.

Six months into fourth grade, Appellant took another CAT.  He scored lower than 91% of the other students and tested at the level of a student seven months into second grade.  In fifth grade, Appellant took a TEAMS test, where he passed the reading section but not the math and writing sections.  He also took a CAT.  He scored lower than 92% of the other students and tested at the level of a student three months into third grade.

In sixth grade, Appellant's grades were as follows: 55 in Social Studies, 53 in "Read Imp," 62 in Science, 52 in English, 53 in Math, and 61 in P.E.  He also took a CAT.  He scored lower than 99% of the other students and tested at the level of a student one month into second grade.  Appellant was retained in the sixth grade.

At this point, the records become somewhat unclear.  The records do not include any grades from the year he was supposed to repeat sixth grade or from seventh and eighth grade.  The records, however, show that he attended ninth grade the year he would be in seventh grade (if he repeated sixth grade).  The records indicate that he was retained in the ninth grade.  The grades for both his years in ninth grade were numerical

grades split between two semesters. The grades were as follows:

| | 9th | | 9th | |
|---|---|---|---|---|
| **English** | 50 | 50 | 41 | 50 |
| **Math** | 50 | 50 | 62; 72 | 50 |
| **Science** | 50 | 50 | 57 | 50 |
| **Social Studies** | 55 | 50 | 61 | 50 |
| **P.E.** | 50 | 60 | 72 | 56; 55 |
| **Health** | N/A | N/A | 53 | N/A |

During his second time in ninth grade, Appellant received a special education exemption from the Texas Assessment of Academic Skills ("TAAS test"). The records do not include TAAS test information from his first time in ninth grade. Appellant then dropped out of school.

ii.    *School Officials' Testimony–Conceptual Domain*

Dorothy Stamps, Appellant's first grade teacher, testified that Appellant was capable of doing the school work and, if he would have applied himself, he could have done the work. Morris Lee, an assistant principal at Appellant's elementary school, also testified. He was asked: "[Appellant] chose not to apply himself, even as a young man. Is that right?" Lee responded, "Not in appropriate directions."

Eddie Fowler, a principal at Appellant's middle school, testified that Appellant was placed into a special education program called "the self-

management program." Fowler said that this placement was "not necessarily because [Appellant] was so far behind, but because he was a discipline problem." When asked "[s]o [Appellant] wasn't in Special Education because of any mental defect or because he was [intellectually disabled], was he," Fowler responded, "No." Fowler agreed that, after reviewing Appellant's school records, Appellant was "pretty average." Fowler also agreed that, if Appellant applied himself, he could have been successful.

### iii.    *Dr. Craig's Testimony—Conceptual Domain*

Regarding Appellant's strengths in the conceptual domain, Dr. Craig testified:

> When you just hear him talk, when he does talk—although he tends to be somewhat quiet—I mean, he speaks in complete sentences, and so he could, in that sense, quote, "pass for normal." He can write pretty good. I mean, he can write his own address, including the zip code and so on. He had pretty good self-direction. He could go around in the community, go out alone, and he did often. In fact, he would tend to wander away from any kind of group going on, and he at least appears to listen when people are talking to him. You don't know whether or not he's really paying attention, but he does appear to listen.

Regarding his limitations in the conceptual domain, Dr. Craig testified:

> Very limited conversational skills. It's really hard to engage in a conversation with him. He just won't follow the conversation. You can't get a response to what you're saying.

> In terms of getting along in the world, it was routinely noted that he was unable to read menus. I mean, he would have to order things—if he went out to, you know, a fast food restaurant or something, he would have to order by the picture, just saying what he knew it was. He could not calculate the correct change. And you really couldn't depend on him time-wise. He was irresponsible regarding time commitments.

### iv. *Appellant's Testimony—Conceptual Domain*

Appellant testified about becoming a pen pal with Kimberly and stated that they wrote three or four letters a week to each other. Appellant testified that the letters were in his handwriting. Appellant stated that he had help from different people when writing the letters. When asked what he meant by that, Appellant responded: "Like spell and, you know, I write down what I want to say, and then they will put it into sentences and stuff for me." Appellant also testified that he wrote letters to Kimberly's daughter, A.W.

Appellant agreed he had printed out the maps for the trip to Waco, where the crime took place, and paid for everything on the trip. Appellant was asked about documents found by law enforcement in his Suburban. One of the documents, the "Cartel Boxing Promotions Business Plan Prepared By Petetan," had a biography section, which was read aloud to the jury. It read:

> Born in Port Arthur, Texas, Carnell Petetan, Jr. has his share of ups-and-downs. The tough street of his hometown groomed him into the dynamo he is today, and now, armed with a wealth of resources, skills and abilities, he is set to launch the long anticipated CARTEL BOXING PROMOTIONS.
>
> Co-Founder of Tripple Gold Records, along with brother and business partner, Herbert Mouton, Carnell Petetan has emerged with a vision so ambitious, success is eminent.
>
> The key feature and strength behind Cartel rests in the fact that for eighteen years of his life, he survived in Texas prisons; some of the deadliest in the nation. This is where he honed his leadership abilities and educated himself.
>
> Now this wise and intelligent young man is ready to take on the world. Surrounded by a support team of experts, his Cartel Boxing Promotions will quickly become an industry great in the years to come.
>
> You've seen the rest, now prepare for the best.
>
> Carnell enjoys reading, video games, and brainstorming. The author of over 800 songs, Carnell is also the respected and rising rap star, "Don Cartel". Look for the documentary, "unshackled", coming soon. With success looming over him, Carnell promises to stay grounded and Always put God First.

Appellant denied he wrote it. He also denied writing a 40-page autobiography that was found in the Suburban.

### v. *Appellant's Mother's Testimony—Conceptual Domain*

Ophelia Ortiz, Appellant's mother, testified that Appellant had a hard time reading and writing. When asked "[w]ould it surprise you to know

that he's a self-admitted writer of over 800 musical songs," Ophelia laughed and responded, "That's funny. No, he's not." Ophelia agreed that it would be difficult for Appellant to write a simple letter to someone and stated, "Somebody would have to help him."

Ophelia said that although the family lived "right by the school" when Appellant was younger, Appellant would forget where to go and "would go another direction." Someone would have to walk him. Sometimes "I would say he was missing, because he was gone, like, sometimes three days and I didn't see him, so the police put a missing person, and they would find him." Appellant could not drive from Port Arthur to Houston. When asked "[w]ould he have trouble with, what, the signs or the roads or what," Ophelia responded, "His remembering, mentally." Ophelia also stated that the only time when they sent Appellant to the store alone, "he went and put the money on the counter and walked out and forgot what I sent him in there to get." Ophelia further testified that Appellant could not make change.

vi. *Appellant's Sister's Testimony—Conceptual Domain*

Sabrina Mouton, Appellant's sister, testified that Appellant did not walk until he was three years old and could not talk, in a manner they could understand, until he was four or five. Up until that time, "if my

mother asked him something, he wouldn't answer, or if she tried to get him to talk, we didn't understand what he was saying, so he just don't say nothing."  When asked about Appellant learning something new, Sabrina said: "He gets frustrated or just like he loses interest in it or he just—like his mind just go blank, like he looking off like he don't care to hear it, you know, when he don't understand something."

Sabrina said that Appellant wrote her letters from prison, but his letters were difficult to understand unless he had someone help him. When asked why she would think someone wrote a letter for him, she said that Appellant's writing "looked like something a preschooler or kindergartner" would write;  but if someone wrote the letter for him, then the letter would be in good handwriting.  Sabrina said his writing had improved "a little bit."  The prosecutor asked Sabrina about one of his letters to Kimberly.  "I'm going to show you what I've admitted into evidence as State's Exhibit 126, and I'm going to do the Carnell Petetan letter grab bag. Go ahead and pick a letter, any letter." Sabrina drew out of the bag a letter postmarked January 24, 2011.  The letter read, in part:

> I Hope and Pray when this letter reaches you it finds you in the best of health as well as spirits in God's Care and Protection as well as your love ones. Kim I want you to know

> I was Glad to hear about your School progress and them welcoming you to Join they organization.

Sabrina acknowledged that the letter was in Appellant's handwriting. She further stated that "those letters look clearer than my letters, and Carnell writes up and down, up and down, and out of the margin and not clear at all." When confronted with the fact that the letter to Kimberly that the prosecutor had Sabrina read did not conform to her "up and down" description, Sabrina stated, "His looks neater on hers than it does on ours."

vii.    *Appellant's Uncle's Testimony—Conceptual Domain*

Thomas Kemper, Appellant's uncle, testified that when Appellant was younger, he was placed in special education because "he couldn't comprehend like any other kid."

viii.    *Appellant's Letters—Conceptual Domain*

Appellant's letters to his pen pal and then wife, Kimberly, were published to the jury and portions were read out loud by the prosecutor. Portions of some of the letters in the State's exhibit are relevant to the conceptual domain. In one, Appellant stated: "Kim I Just wanna Show you Just in Houston Alone 20,000 CDS Pressed up for $10.00 a pop = $200,000. See im Not even haveing to leave houston to get rid of 20,000

records[.] . . . Say i Put 3 records out a year, and make 2000,000 x 3 thats $600,000[.]" In another, he suggested  the raffling of a watch, telling her that if she sold 100 tickets at $25.00, "that's $2,500."  In another, Appellant stated: "I've wrote over 75 Albums Books and universal Records[.]"  In another letter, Appellant included a response that he received from a recording company, Amerecord, stating "that of the numerous poems and songs sent to Amerecord over the past few months, a very select few have been chosen for a pre-production recording session."

ix.    *Analysis—Conceptual Domain*

At trial, there was conflicting evidence regarding Appellant's deficits in the conceptual domain.  The jury could have inferred from Appellant's academic record that he was impaired in the conceptual domain.  Of Appellant's 57 numerical grades included in the academic records, 39 of those grades were failing (or, below 70).  Of the 20 grades Appellant received based on whether he was above average, average, or below average, he was "below average" for 6.  Of the 19 grades he received based on satisfactory, needs improvement, and unsatisfactory, he received needs improvement for eight and unsatisfactory for two. Further, he performed poorly on standardized tests and was placed in

special education at some point.

But there was also evidence that cut against a jury's inference of deficits in the conceptual domain. Appellant received 18 passing (or, 70 and above) numerical grades, 14 "averages," 8 "satisfactories," and 1 "satisfactory plus." The academic records also show that Appellant often had absences in the double digits. And three school officials testified that Appellant failed to appropriately apply himself in school. One of those officials also testified that Appellant was not in special education because of a low IQ but instead because of his behavior problems.

Looking at the conceptual domain on a more discrete level, there was conflicting evidence on Appellant's ability in math reasoning. There was evidence from which the jury could have inferred that Appellant was impaired in it. This evidence included his grades for "Arithmetic" in first through third grade and for "math" in both sixth and ninth grades, along with his scores on the CAT, TABS, and TEAMS tests. This evidence also included testimony from Sabrina that Appellant "never knew how to count [money]" and testimony from both Dr. Craig and Ophelia that Appellant could not calculate change. But on the other hand, Appellant received passing grades for math-related subjects in kindergarten, fourth, and fifth grades. Moreover, Appellant testified that he paid for the trip to Waco

and some of Appellant's letters contained correct calculations.

There was also conflicting evidence on Appellant's writing ability. There was evidence from which the jury could have inferred that Appellant's writing ability was impaired. This evidence included Appellant's scores on the TABS, along with his grades for "Spelling" in third through fifth grade and his grades for "English" in both sixth and ninth grade. It also included Ophelia's testimony that Appellant had a hard time writing and would need help, Sabrina's testimony that Appellant's letters were difficult to understand unless he had help, and Appellant's testimony that he received help from other inmates when writing letters.

Conversely, Appellant received passing grades in "handwriting" in third through fifth grade. Dr. Craig, who evaluated Appellant prior to trial, testified that Appellant can write pretty well. And the jury itself was able to read several letters from Appellant to Kimberly—letters that Appellant admitted were in his own handwriting. Appellant had also written songs and poems well enough to be chosen for "a pre-production recording session."

Further, there was conflicting evidence on Appellant's reading ability. Evidence from which the jury could have inferred that Appellant's

reading ability was impaired included:  Appellant's grades in first, second, third, and sixth grade; his scores on the TABS, CAT, and TEAMS tests; Dr. Craig's testimony that Appellant was unable to read menus; and Ophelia's testimony that Appellant had a hard time reading.  But on the other hand, Appellant received passing grades for "Reading" in both fourth and fifth grade and passed the reading section on both of his TEAMS tests.

There was also conflicting evidence on Appellant's language ability. There was evidence from which the jury could have inferred that Appellant's language ability was impaired.  This evidence included his grades in third grade and fourth grade; his scores on the CATs; and Sabrina's testimony that Appellant was delayed in learning how to talk and that they were not able to understand what he was saying until he was about four or five years old.  On the other hand, in kindergarten through second grade, he was "average" in "Other Language Arts" and he received a passing grade in "Language" in fifth grade.  Further, Dr. Craig testified that Appellant speaks in complete sentences.  And during Appellant's own testimony, the jury was able to hear for itself Appellant's ability to speak.

Lastly, there was conflicting evidence that Appellant's memory was impaired.  There was evidence from which the jury could have inferred

that Appellant's memory was impaired.  This evidence included Ophelia's testimony that Appellant would often get lost, had trouble driving because of his memory, and forgot what he was supposed to buy when he got to the store.  But during Appellant's testimony at trial, the jury was able to gauge for itself Appellant's ability to consistently remember various historical details on both direct examination and cross examination.

For each piece of evidence supporting a finding that Appellant was impaired in the conceptual domain, there was evidence that cut against it.  Therefore, the issue came down to resolving those conflicts and inconsistencies based on credibility and weight determinations.  That's the jury's duty, and we defer to the jury's determinations.

### c.    Social Domain

The second domain—social—"involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others."  This was Appellant's strongest domain.  The informants thought he had good social skills.  He "could get along with people and he could kind of blend in."

#### i.    *Dr. Craig's testimony—Social Domain*

Dr. Craig's conclusions were as follows:

A.      Areas of strength for him was that he has friends. He had good relations with his family. He was actually able to interpret others' emotions. He could tell when somebody was upset, and he even showed some ability with leisure skills. He likes to listen to music.

Q.      By "skills --"

A.      Those are strengths for him.

Q.      Strengths. Okay. And his limitations?

A.      He doesn't understand jokes. I mean, it's too complex.

Q.      How do you determine that? If you're talking about a self-evaluation, for example, do you tell him a joke and see if he gets it or do you ask him? How do you determine that?

A.      You know, I asked him, you know, "Do people tell you things that make you laugh," and he said, "No."

Q.      And then other people that are just general informants, you can say, "Does he understand jokes?"

A.      Yeah. I mean, "Can you joke around with him, and does he get the jokes?"

Q.      Okay.

A.      And they repeatedly noted that he was easily led by other people, that the basic social skills of being polite and offering to help people, he simply doesn't do it. He doesn't say thank you. He doesn't give gifts. He doesn't offer assistance to people. And this was a uniform finding too. He didn't engage in games. The only games we ever heard that he played were with a cousin who played Hide and Seek with him, and this was when he was older, too. But he simply didn't understand any kind

of simple kind of games that, you know, kids play. He showed no interest in most—what a lot of people use for leisure, which is TV.  I mean, he has consistently over the years never shown the least bit of interest in TV.

> ii.    *Analysis—Social Domain*

There was conflicting evidence regarding Appellant's deficits in the social domain.  The jury could have inferred from Appellant's relationship with Kimberly that Appellant was not impaired in the social domain.  While in prison, Appellant was not only able to become pen pals with Kimberly, a person Appellant did not know before she was encouraged by Appellant's brother to contact him, but to develop their friendship into a serious romantic relationship resulting in marriage—a clear indication of his "friendship abilities."  Further, Appellant remained married to Kimberly from 2010 through the spring of 2012, when Appellant was released from prison.  And although Kimberly considered divorcing Appellant shortly after he moved in with her, the two reconciled.  After a falling out a few months later, the two again reconciled.  Thus, the jury could have reasonably concluded that Appellant possessed at least some meaningful "awareness of others' thoughts, feelings, and experiences" because Appellant was able to successfully reconcile with his wife on more than one occasion.

By his own words, Appellant was also helpful to other prisoners, encouraging them to be polite.  He related in his letters that he was a mentor to other inmates—"nice as can be" young males who did not belong behind bars.  He told them how to act when they get out: "help little ole ladies across the street, and lend your neighbor a cup of sugar in advance."  His letters are replete with offers to help Kimberly and her daughter and appreciation for their own letters and love.

Finally, the jury could credit Appellant's own statements made in his letters to Kimberly, which, as is detailed later in this opinion, indicated a history of playing baseball, bowling, boxing, working out with weights, and watching sports on television.  As a result, the jurors did not have to rely on lay stereotypes about the intellectually disabled to reject Dr. Craig's testimony, or that of Appellant's own family.  They could reject his testimony as unreliable because it was based on interviews with vested witnesses and inconsistent with much of the record evidence.

### d. Practical Domain

The third domain—practical—"involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of

behavior, and school and work task organization, among others."[133]

i.  *Dr. Craig's Testimony–—Practical Domain*

Dr. Craig, based on his assessment, concluded that Appellant "had a lack of practical skills to get through the day."  He stated that all four of his "informants"—Appellant himself and Appellant's mom, sister, and uncle—represented that "his practical skills, doing things on a day-to-day basis like taking care of himself, feeding, cooking something to eat, he had simply not developed those skills."  Dr. Craig gave the following specifics on the practical domain:

> Q.  What about his skills and limitations on the practical portion of the test?
>
> A.  He was able to walk to familiar locations.  Again, in his neighborhood he could get along just fine.  I mean, he knew how to find places. He couldn't necessarily tell you street names, but he knew where things were geographically.  He could make simple meals for himself, and this was kind of like a little idiosyncratic thing about him. He never learned to use a fork. I mean, he would sometimes use a spoon, but every bit of food that you gave him, he would wrap up in bread. That's how he ate. I mean, he made a sandwich out of everything. So in terms of the typical kinds of table skills, eating skills, he simply, either by choice or just lack of ability, he didn't do. It's fairly common for people, even with mild [intellectual disability], to  have difficulties cutting their food into bite-size  portions. Somebody may have to do

---

[133] DSM–5 at 37.

that for them. I'm not sure if that was the case with him, because he didn't use a knife. He just used a spoon. He was able to take medications. He was able to swallow them. He didn't resist that. And he could dress himself. He didn't necessarily dress himself well, but he could do the physical act.

Q.    And his limitations?

A.    Even though he could get around the community, he was unable to use a map. He relied on the ability to—either people tell him familiar locations or whatever, and he got lost fairly easily. He did not do housekeeping. He was described as a terrible housekeeper and never made his own bed, was unable to learn how to operate most common appliances, broke microwaves because he didn't know how to use them, put the wrong things in them, had no conception about how to use a washer or a dryer. And even in the area of first aid, I mean, when asked what he would do if he cut his finger, he said he would sop it up. "Sop the blood up," that was his response. So he didn't—he just wasn't worried that way where he would know to put a Band-Aid and some Bactine or something on it.

Dr. Craig said that, for clinical purposes of a finding of significant limitations in adaptive functioning, the reason that the adaptive skills were not learned does not matter. Practical skills "don't necessarily even go along with intelligence. I mean, in some ways the adaptive skills are very sensitive to what kind of training the person has received." Practical skills can be limited "because their family was overprotective and did everything for them and weren't good enough trainers or they weren't

patient enough to allow them to learn how to do it on their own, and so they just never learned how to do it and they just came to expect their family to take care of it." Speaking specifically about Appellant, Dr. Craig said:

> What caused all this, you know, is hard to say, but one likely explanation is that there were many missed opportunities to learn these skills. He has spent the majority of his life incarcerated, and he simply hasn't had the opportunity to be around—I mean to learn those kind of skills on a consistent basis. And I think in his home environment, even when he was living there, the parental supervision was not such that he was expected to do it or, you know, the training was given to him, so he simply didn't learn those skills. And being locked up most of his life, he has adjusted to prison routine, I guess. But in terms of adaptive skills, he is very limited.

ii.     *Appellant's Mother's Testimony—Practical Domain*

Appellant's mother, Ophelia, testified that Appellant was a bed-wetter and she did not "know if he has stopped yet. All his life he been peeing on himself." She testified that, as a child, Appellant could not tie his shoes, dress himself, take a bath, brush his teeth, or follow directions. He did not have any interests as a child; he did not play with toys, watch television, or play video games. He would "just sit there" or walk out and leave, and family members would not know where he went.

When Appellant left prison, he could not keep his apartment clean, so his sister would come over and clean it. Appellant did not wash

dishes, did not put food away, and left clothes strewn across the floor. He could not use a washing machine or a dryer. He still did not watch television, and he could not operate a cell phone. Appellant also could not be trusted with money because he could not make change. He could not drive.

When cross-examined about Appellant's alleged various "business plans," Ophelia testified she did not pay them any mind because "I know he [doesn't] know what he's talking about." Ophelia acknowledged that Appellant worked with his uncle cutting yards when he was on parole, that he had tried baseball but did not have the patience for it, and that she had bought him the Suburban.

### iii. *Appellant's Sister's Testimony–—Practical Domain*

Appellant's sister, Sabrina, testified that Appellant wet himself even when he was older. She also said that "Carnell never played sports or nothing with us. He would always just [wander] around." Appellant had no special interests—"Not even television. We all would watch television. He wouldn't watch it. Games, he didn't want to play any games, nothing." Appellant could not ride a bicycle; "He would try, but he couldn't."

Sabrina testified that, when Appellant was released from prison, she helped set up and furnish an apartment for him. She tried to teach

him how to use a cell phone and microwave, but he could not figure either out. Sabrina said she would go over to the apartment twice a day to make sure Appellant had enough to eat and to clean up because Appellant would not clean up after himself. There would be "[f]ood laying around, candles lit for no reason. Very tacky, nasty towels, his underwear and stuff." Appellant did not know how to count money; he always asked his siblings "how much something is, how much this is." Sabrina said that Appellant had unrealistic expectations about what he could do, "Like he would tell me he want to be rich or he's going to do music or he's going to have a business, and I'm, like, 'Carnell, it takes money, and you've got to get a job' or 'Carnell, you left here with a school ID. You've got to get a driver's license to do anything,' you know."

Sabrina agreed that Appellant showed some interest in extracurricular activities as he got older, and that he "likes his music. He does music . . . he records music." Sabrina also acknowledged that Appellant had been in prison since the early 1990s and had never lived on his own before he was released from prison. And she admitted that Appellant had tried to better himself in prison and that he was able to formulate business plans "[f]rom books that he got out of the library."

iv.   *Appellant's Uncle's Testimony––Practical Domain*

Thomas Kemper, Appellant's uncle, testified that Appellant was "really slow" and "had problems making decisions on his own." According to Thomas, "Little kids would make him do things that they didn't want to do, that they wouldn't do, and they would use Carnell, because he was real slow." Thomas also said that Appellant would crawl up under a train even though other children would beg him not to. When he was twelve years old, Appellant had to be told not to open the door when someone knocked without first asking who it is. "He wouldn't comb his hair . . . . [H]e wouldn't take a bath, [and] he wouldn't put on a belt."

When Appellant was released from prison, he wanted to be a businessman, but Thomas testified that Appellant "couldn't understand how to go from [Point] A to Point Z." Thomas said that Appellant had "great big dreams," but

> [b]eing locked up all these years and knowing the first thing that you start a business and, you know, you say something simple to him like, "Carnell, first you need to get a DBA." "What is a DBA?" You know, "Carnell, you need to open up your checking account." "A checking account with what and how?" Everything that you say, you had to explain it to him, because he didn't—and even if you explained it to him, he still did not understand.

Thomas said that he never saw Appellant deal with money and that Kimberly handled the social security income Appellant received.

### v.    *The Gauthiers—Practical Domain*

Appellant came to live with the Gauthier family when he was thirteen or fourteen years old.  Cathy Gauthier was Appellant's aunt, and she had two children, Caston Gauthier and Kimberly Jackson.  Cathy testified that Appellant was a little bit slower than her own kids, but she never had to discipline him.  Appellant was just a little different, "real quiet all the time."  Appellant "always had big dreams" of being a bondsman or a rapper.  Cathy explained to Appellant that he could not be a bondsman because he had a felony conviction, but Appellant did not seem to understand that.

Caston likewise described Appellant as being mentally slow.  While visiting Appellant in prison, Caston knew he could not talk to him about anything dealing with his profession "because he probably wouldn't have caught on to anything that I was talking about."

Kimberly Jackson was fourteen years old when Appellant came to live with them.  She described Appellant as "a little different" and "not on the same level, mind-wise," being "slower."  Appellant was her age, but she said that he could not do the same things she could.  Her family had to "stay on" Appellant about his hygiene.

### vi.    *Adrian Miller—Practical Domain*

Miller testified that Appellant used his phone on the trip to Waco, but he wasn't good at it.

Q.    Carnell couldn't use his phone?

A.    Not to get it to just go to the phone and do the things that he probably would have wanted to do. The only thing, from my understanding, how he knew how to do was maybe text a little bit, use the little thing to record things or whatever, but once Kerrie deleted—turned the phone off, he didn't know how to use it.  So when we got to the Bryan police station and they put each one of us in the interrogation rooms, he had to send the phone to Kerrie because he couldn't even turn it back on.

### vii.    *Appellant's Letters—Practical Domain*

Several letters in State's Exhibit 126 are relevant to the practical domain.  Regarding nutrition, he encouraged Kimberly to take Omega3 fish oil as well as vitamins.  He said they would eat healthy when he got out and told her he was only eating "fish and chicken."  He also talked about being on a salad diet.  When he didn't like what they were serving on his unit—pork meatballs which were "never fixed right"—he made tuna and rice.

Some letters indicate interests.  Appellant spoke of getting boxing gloves and weights for Christmas—"his first Christmas present."  Though he'd lost interest in baseball, "my love for boxing never died."  He asked Kimberly to "go online and look up Local Boxing Gold Gloves Tournaments

Local Reginal & National . . . down load all the info form me." Several times he talked about his schedule, and it always included lifting weights.

His letters indicated he watched TV. "Every Friday on ESPN2 they air Friday night fights." He also referred to watching a documentary on the Tyson/Seldon fight and an NFL game. He told Kimberly that he wanted them to go to Vegas to watch "a big fight" as their first vacation once he got out of prison. He also asked about boxing gyms in Waco.

Appellant referenced a radio program he listened to called "Damage Control" and that "they play a lot of underground music it comes on at 11:00 til 2:00." He complained about his station "97.9 the Box" not playing Sweet James Jones—the solo album by Pimp C. He told Kimberly that he took part in a show in prison—one that included "like 16 Different Acts"—and that he had worked on his music for it for three months. He said there was "all kinds of talent inside this Place."

Appellant knew that his social security check was around $3,000; in a letter to Kimberly, Appellant told her the steps to take to get her own social security check for a "mental disability." He told her to "go to the Social Security office in Waco, get a form and fill it out" under mental disability. He told her what to say to the case worker and doctor to become eligible. "You will get 1200" a month. In another letter, he

talked about how to make money grow, telling her it made more sense to invest a large sum of money rather than spend a good hunk on it on an expensive car, and how "you can't loose with real estate." He knew the approximate cost of a used Bentley, $175,000; and the approximate cost to rent a car, $25 or $28 a day.

He also wrote about: imposing a sliding scale membership to a facility he wanted to start to keep kids off the streets—a fee of three dollars a month for low income kids and $25 for the others; giving Kimberly $250 to help her pay for her education; and how, after his parents divorced, his Dad gave his Mom $500 a month that he never saw.

These letters contained numerous excerpts and references to books Appellant read—many of them self-help books. He told Kimberly that he reads "books in my cell and these books have become my best friends." He shared quotes with Kim, one saying, "Anything that you're not grateful for is Baggage—Anything you are thankful for is fuel." He asked if she agreed with the quote and asked her to answer the question: "what Baggage do you need to get rid of and what steps will you take to rid yourself of this Baggage?"

In one letter, he advised Kimberly to not let A.W. play outside unsupervised. Another expressed an intent to join the "Three Five Seven

Graveyard Crip set." Still, others set out various grandiose (and not so grandiose) money making ideas. All the letters contained misspellings, and punctuation errors. Appellant comes across as sometimes sweet, sometimes controlling.

### viii. *Analysis—Practical Domain*

At trial, there was conflicting evidence regarding Appellant's deficits in the practical domain. The jury could have inferred from Appellant's family member witnesses and Dr. Craig's conclusions that he was impaired in the practical domain. Appellant received a score of 1 (out of 3) on almost every home living task, including folding clean clothes, taking out the trash, clearing the table after a meal, making the bed, making minor repairs, putting things in their proper place, sweeping the floor, cleaning his room, cleaning the bathroom, mixing and cooking fairly complex foods, and dusting the furniture. And there is scant evidence that he did any of these day-to-day household chores.

But Dr. Craig was not the fact-finder in this case. The jury could have doubted the efficacy of the ABAS-II given Dr. Craig's circumscribed pool of "informants." Dr. Craig testified that he assumes the informants give him the correct information. But the family members responding to the ABAS-II were aware of the implications of their responses. Although

Dr. Craig was not eager to admit it, all of the family members had an obvious vested interest in the outcome of their interviews with Dr. Craig: saving Appellant from a possible death penalty.[134]  "Indeed, individuals who have a close bond with the defendant/appellant have an identifiable, external incentive, to create the impression that the individual is impaired enough to meet the diagnostic criteria for [intellectual disability]."[135]

Looking at the practical domain on a more discrete level, there was conflicting evidence on Appellant's ability to use money.  Appellant's mom and sister testified that he could not be trusted with it because he could not make change, couldn't count it, and couldn't figure out how much things cost.  His uncle testified that Appellant was not the spouse who dealt with money;  Kimberly was.  This was evidence from which the jury could have inferred that Appellant was impaired in a very basic and critical practical skill—the use of money.

But jurors had Appellant's own statements and the testimony of others indicating otherwise.  Appellant repeatedly testified that he went

---

[134] *See* Bridget M. Doane, Karen L. Salekin, *Susceptibility of Current Adaptive Behavior Measures to Feigned Deficits*, 33 LAW & HUM. BEHAV. 329, 331 (2009) ("Perhaps the most important caveat to keep in mind when using any measure of adaptive behavior is that the information obtained is limited by many factors including, but not limited to, the knowledge base of the rater, the extent of contact between the rater and the person of interest in one or more settings, and the candor of the rater.").

[135] *Id*.

to Waco to get a $300 deposit from his cousin to give to his wife. He acknowledged he paid for the gas, room, food, beer, and cigarettes. He was aware of the approximate cost or value of things: a social security check, a used luxury car, a rental car, and alimony. He demonstrated an awareness of the concept of the sliding scale.

And Appellant's representations in this regard were corroborated by others. Adrian Miller testified that when they were driving to Waco, he pumped the gas and Appellant paid $70 cash for it from his wallet. Miller also testified that, when it came to renting the room, Appellant gave a man money to rent it for him. He also gave a woman an appropriate amount for a ride. After the murder, Appellant gave Miller $60 to fill up the Suburban.

Inmate Azikin Daniels testified that Appellant told him about owning "Cartel Records," showed him how to file a DBA form, and explained to Daniels that an artist receives only a percentage of money from each record sale. All of this testimony about Appellant's use and understanding of money could have provided a basis for a rational jury to discount Appellant's family members' assertions that Appellant could not handle money.

There also was conflicting evidence on whether another of

Appellant's alleged deficits—the inability to use a modern cell phone ("a pervasive and insistent part of daily life")—was real.[136] Sabrina indicated that Appellant could not use a cell phone and that he could not learn to use one. But the jury could have credited evidence showing that Appellant did in fact know how to use a cell phone. Appellant testified that he and Kimberly both had cell phones. He testified about several phone calls he made or received. He said that when he went to Kimberly's apartment, "Kim opened the door. She backed up. She said, 'Why you ain't texted or called me.'" In his exculpatory account of September 23rd, Appellant testified that he had a cell phone and was going to use it to call "9-1-1" but stopped when Miller pointed the gun at him and took his phone away. Though the jury did not believe Appellant's testimony, they were free to believe he had a cell phone. Kimberly's adult daughter, Kristin Warmack, testified that her mom and Appellant had cell phones that were in Appellant's name, and she was able to communicate with her mom until Appellant cut off service.

Adrian Miller testified that Appellant used his cell phone in compromising situations before the Waco trip, which Miller theorized was

---

[136] *Riley v. California*, 573 U.S. 373, 385 (2014) (modern cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy").

an effort to create evidence.  "He even passed by the neighborhood one day holding his cell phone out the window . . . He was driving down the street like he was taunting me. He was already plotting it."  "I think one day he even called Kimberly and he told me, 'I'm going to give you this piece of dope. I want you to cuss this lady out.'  I cussed her out, but then he grabbed the phone, and he would do, like, 'Oh, man, stop doing that. Man, this is my wife,' this and that, but to try to make me—try to make it seem like I'm doing it. He was the one doing it."  At one point, Appellant dangled "a nickel piece of crack rock" to get Miller to repeat things while recording him.

Similarly, there was conflicting evidence on whether Appellant's family members lacked candor in attesting to Appellant having no interest in recreation.  Ophelia and Sabrina both testified that Appellant had no special interests—he did not play games or watch TV.  But the jury could credit Appellant's own statements made in his letters to Kimberly, which indicated a history of playing baseball, bowling, boxing, and working out with weights.  And the jury had before it letters indicating he watched sports on television.  Appellant also expressed a past and current interest in music, specifically, rapping, and listening to the radio.

Nothing in the record "rules out" Appellant having significant

limitations in the realm of practical skills. But Appellant's evidence of adaptive deficits was subject to a credibility assessment. Under a legal sufficiency analysis, a rational jury could have rejected Appellant's claims that he possessed adaptive deficits suggesting intellectual disability in light of all the evidence before it.

### e. Conclusion — Legal Sufficiency

Dr. Craig himself acknowledged many of the shortcomings in his testing: the ABAS–II is not normed for retrospective assessments; the pool of "informants" used to rate Appellant's adaptive behavior was identified by the defense; every single person in that pool was related to Appellant; Dr. Craig conducted the interview only once per informant; and the interviews (except for Appellant's) were conducted by telephone instead of in person. Appellant's evidence of adaptive deficits was subject to a credibility assessment and was evidence that a jury could—in light of all the evidence before it—reasonably reject.

The evidence is legally sufficient to support the jury's adverse finding on the intellectual disability issue. As discussed above, the jury could simply reject the testimony that Appellant had adaptive deficits—one of the three elements of an intellectual-disability diagnostic definition. "The finding of the factfinder rejecting a defendant's

affirmative defense should be overturned for lack of legal sufficiency only if the appealing party establishes that the evidence conclusively proves his affirmative defense, and "no reasonable factfinder was free to think otherwise."[137]  Given that Appellant had one IQ score that was over 70, and, as set out above, there were record-based reasons to discount the results of the ABAS–II, we cannot say that the evidence supporting the negative finding was legally insufficient.

## IV. The Evidence Was Factually Insufficient To Support The Jury's Adverse Finding On Intellectual Disability.

### A. Standard of Review

Holding that the evidence is legally sufficient is the starting point for a factual sufficiency review.  While evidence may be legally sufficient to support a jury's determination, it may nevertheless be factually insufficient to reject an affirmative defense.  When examining whether an appellant established his factual-sufficiency claim, the appellate court views the entirety of the evidence in a neutral light, rather than the light most favorable to the verdict.[138]  But the appellate court may not usurp the function of the jury by substituting its judgment in place of the jury's

---

[137] *Butcher*, 454 S.W.3d at 20.

[138] *Matlock*, 392 S.W.3d at 671; *Neal*, 256 S.W.3d at 275.

assessment of the weight and credibility of the witnesses' testimony.[139] An appellate court may sustain a factual sufficiency challenge on appeal only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased.[140] If an appellate court conducting a factual-sufficiency review finds that the evidence supporting the affirmative defense so greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, then the appellate court may reverse the trial court's judgment and remand the case for a new trial.[141] The remedy in both civil and criminal cases for an appellate reversal based upon a factual-sufficiency claim that the jury's verdict is against the great weight of the evidence is a new trial, not an acquittal.[142]

As discussed above, the Supreme Court has set out certain constitutional minimums in any assessment of intellectual disability.

---

[139] *Matlock*, 392 S.W.3d at 671.

[140] *Id.*

[141] *Id*. at 672.

[142] *Id.*

First, the analysis must be informed by the current medical diagnostic framework for assessing intellectual disability.[143] Specifically, courts cannot focus upon one aspect of diagnostic criteria when clinicians would consider other aspects to reach an overall conclusion regarding intellectual ability.[144] In both *Hall* and *Moore I,* the Supreme Court rejected the use of IQ scores to foreclose inquiry into adaptive deficits because it created too great a risk that someone with an intellectual disability would be executed.[145]

Second, courts may not place undue emphasis upon adaptive strengths when rejecting an intellectual disability claim.[146] In *Moore I*, the Supreme Court overturned this Court's reliance upon lay evidence of adaptive strengths to overcome the clinical evidence of adaptive deficits.[147] In *Moore II*, the Supreme Court summarily reversed this

---

[143] *See Hall*, 572 U.S. at 721; *Moore I*, 137 S. Ct. at 1048 (explaining that it clarified in *Hall* that a court's intellectual-disability determination "must be informed by the medical community's diagnostic framework" and stating that it relied on the most recent versions of the leading diagnostic manuals).

[144] *See Hall*, 572 U.S. at 723 (Florida's IQ test rule takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity when experts in the field would consider other evidence; therefore, defendants must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits).

[145] *Id.* at 704; *Moore I*, 137 S. Ct. at 1051.

[146] *See Moore I*, 137 S. Ct. at 1050.

[147] *Id.* at 1051–52.

Court's reliance upon evidence of adaptive strengths when that evidence was used to undermine the credibility of a clinician's diagnosis.[148]

Most importantly, the Supreme Court has been willing to overturn this Court's rejection of intellectual disability even when that rejection was based upon the rational resolution of factual conflicts by a factfinder. In *Moore II*, the Supreme Court went beyond making a legal ruling and corrected this Court's "factual findings."[149]  It did so over a dissent that criticized the Court for usurping this Court's role as factfinder on a writ of habeas corpus.[150]

In this case, viewing the evidence in a neutral light, the rational resolution of evidentiary conflicts surrounding the adaptive deficits testimony fails to fully account for the great weight and preponderance of diagnostic evidence establishing subaverage intelligence.  Though the jury could rationally reject evidence showing adaptive deficits in isolation, failing to consider that evidence in conjunction with the evidence of

---

[148] *Moore II*, 139 S. Ct. at 670.

[149] *See id.* at 670–73 (contrasting conclusions of "the trial court" with the view of "the court of appeals").

[150] *Id.* at 673 n.1 (Roberts, J., dissenting).

subaverage intelligence runs afoul of *Hall*.[151]  Under a proper diagnostic framework, intellectual disability is determined by considering all three diagnostic criteria together rather than each one in isolation.[152]  Allowing the rejection of one diagnostic criterium when clinicians would consider criteria together creates an unconstitutional risk that an individual with an intellectual disability will be executed.

Second, emphasizing Appellant's adaptive strengths to undermine reliance upon an expert diagnosis repeats the problem identified by the Supreme Court in *Moore I* and *Moore II*.  Though clinicians may rely upon evidence of adaptive strengths when making an intellectual disability diagnosis,[153] allowing the jury to reject such a diagnosis by overemphasizing that evidence places the focus upon adaptive strengths

---

[151] *Hall*, 572 U.S. at 727 ("In the context of a formal assessment, the existence of concurrent deficits in intellectual and adaptive functioning has long been the defining characteristic of intellectual disability.") (internal quotation omitted)*.*

[152] *See id.* at 723 ("It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment."); *Atkins*, 536 U.S. at 318 ("[C]linical definitions of [intellectual disability] require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.").

[153] *Moore I*, 137 S. Ct. at 1050 n.8 ("The dissent suggests that disagreement exists about the precise role of adaptive strengths in the adaptive-functioning inquiry. But even if clinicians would consider adaptive strengths alongside adaptive weaknesses within the same adaptive-skill domain, neither Texas nor the dissent identifies any clinical authority permitting the arbitrary offsetting of deficits against unconnected strengths in which the CCA engaged.").

rather than adaptive deficits.[154]  Further, it encourages the jury to rely upon lay stereotypes regarding intellectual disabilities to reject a clinical diagnosis.[155]

Expert after expert diagnosed Appellant with mild intellectual disability:  Dr. Harold Scott ("mild [intellectually disability] versus borderline intellectual functioning"); Dr. Coxe ("mildly [intellectually disabled]"; Dr. Correia ("mild intellectual disability"); Dr. Mayfield, ("global delays across all domains"); Dr. Craig (adaptive assessment scores fell within the range for moderate intellectual disability).

Appellant consistently scored within the range for intellectual disability on intelligence testing administered across decades.  Mild intellectual disability is typically used to describe people with an IQ level of 50–55 to approximately 70.[156]  Evidence of six full-scale IQ scores since 1991 were admitted.  All but one on its face put Appellant within the clinically-accepted range of intellectual disability:

> 61    on the Wechsler Intelligence Scale for Children - Revised

---

[154] *See Moore I*, 137 S. Ct. at 1050 (deeming this Court's reliance on Moore's perceived adaptative strengths as an overemphasis because the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*).

[155] *See id.* at 1052 (explaining that "the medical profession has endeavored to counter lay stereotypes of the intellectually disabled").

[156] *Atkins*, 536 U.S. at 309 n.3 (citing DSM–4 at 42–43).

(WISC-R), administered in 1991 (age 15);

64 on the WISC-R, administered in 1992 (age 16);

74 on the Wechsler Adult Intelligence Scale-Revised (WAIS-R), administered in 1992 (age 16);

69 on an unknown intelligence instrument, administered in 1993 (age 17);

55 on the WAIS-III, administered in 2012 (age 36); and

52 on the WAIS-IV, administered before trial (age 37).

In our original opinion we discounted all but the score of 74, and noted that, even when the three-point margin of error was considered, "the score at the low end of the margin-of-error range would be 71—still above the general ceiling for [intellectual disability], albeit barely."[157] We concluded, "[t]his was some evidence that appellant's general intellectual functioning fell above the range for [intellectual disability]."[158] Of course, "[i]t is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment."[159] According to the DSM-5, a comprehensive evaluation includes an assessment of intellectual capacity and adaptive functioning; identification of genetic and nongenetic

---

[157] *Petetan*, 2017 WL 915530, at *24.

[158] *Id.*

[159] *Id.* at 723.

etiologies; evaluation for associated medical conditions (e.g., cerebral palsy, seizure disorder); and evaluation for co-occurring mental, emotional, and behavioral disorders.[160] As the Supreme Court observed in *Hall*, IQ scores are an approximation of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks.[161] This is why clinical judgement is needed in interpreting the results of IQ tests.[162] And, unlike many *Atkins* cases, where the IQ scores start out high and get lower once the incentive to score low arises, Appellant's scores started out low and stayed there.

We have said that jurors are free to reject expert testimony if the testimony fails to comport with the jurors' concepts of sound logic.[163] In choosing to disregard expert testimony, the jury is constrained only by the requirement that any action taken must be pursued in a nonarbitrary manner.[164] We said this in a case addressing sanity. And, like insanity,

---

[160] DSM-5 at 39.

[161] *Hall* 572 U.S. at 722 (quoting the DSM-5 at 37).

[162] DSM-5 at 37.

[163] *Graham v. State*, 566 S.W.2d 941, 951 (Tex. Crim. App. 1978).

[164] *Id*. at 950–51 (recognizing that a defendant is not entitled to a judgment of acquittal simply because he offers expert testimony on the issue of insanity and the government attempts to rebut it without any expert witnesses; "While a jury may not arbitrarily disregard expert testimony, it also may not give conclusive effect to the opinion of an expert merely because that opinion is not challenged by some other expert") (internal quotation marks omitted).

intellectually disability is expressed in terms of a mental diagnosis, but the issue is not strictly a medical one.  What we have said about insanity is true here too:

> The issue is not strictly medical, and expert witnesses, although capable of giving testimony that may aid the jury in its determination of the ultimate issue, are not capable of dictating determination of that issue. Only the jury can join the non-medical components that must also be considered in deciding the ultimate issue. That ultimate issue of criminal responsibility is beyond the province of expert witnesses. Were it otherwise, the issue would be tried in hospitals rather than the courts.[165]

The ultimate issue in this case is not criminal responsibility—it is whether Appellant has an intellectual disability that diminishes his personal moral culpability.  But that issue, like the insanity issue, is ultimately for the factfinder, not the expert.[166]   So, the "legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework."[167]

In this case, the medical community was of one mind.  We cannot hold the evidence supporting the adverse finding factually sufficient

---

[165] *Graham*, 566 S.W.2d at 949.

[166] *See id.* at 952.

[167] *Hall*, 572 U.S. at 721.

because there was no competing medical evidence.[168]  Had there been,

we might be assured that the jury's rejection of the evidence of

intellectual disability did not run afoul of Supreme Court precedent.  After

*Moore I* and *Moore II*, a factfinder cannot substitute its opinion for that

of *all* of the examining doctors.  We therefore conclude that the jury's

rejection of Appellant's intellectual disability claim was clearly wrong and

manifestly unjust.  Having determined the evidence was factually

insufficient, Appellant is entitled to a new punishment hearing.[169]

## Conclusion

Appellant was not and is not constitutionally entitled to a pre-trial

---

[168] *Petetan*, 2017 WL 915530, at *26 ("No psychological expert testified definitively—during appellant's capital murder trial—that appellant was not [intellectually disabled].").

[169] *See Matlock*, 392 S.W.3d at 672 (explaining that reversal based upon factual-sufficiency claim is a new trial, not an acquittal); *Brownlow v. State*, No. AP-77,068, 2020 WL 718026, at *23 (Tex. Crim. App. Feb. 12, 2020) (not designated for publication) (remedy for a meritorious factual-sufficiency claim is a new punishment hearing, not reformation of the sentence).  After *Moore II*, this Court has granted relief on several Applicants' intellectual disability claims.  See the following unpublished opinions: *Ex parte Williams*, WR-71,296-03, 2020 WL 7234532, at *1 (Tex. Crim. App. Dec. 9, 2020); *Ex parte Gutierrez*, WR-70,152-03, 2020 WL 6930823, at *1 (Tex. Crim. App. Nov. 25, 2020)  *Ex parte Guevara*, WR-63,926-03, 2020 WL 5649445, at *3 (Tex. Crim. App. Sept. 23, 2020); *Ex parte Lizcano*, No. WR-68,348-03, 2020 WL 5540165, at *1 (Tex. Crim. App. Sept. 16, 2020); *Ex parte Escobedo*, WR-56,818-03, 2020 WL 3469044, at *1 (Tex. Crim. App. June 24, 2020); *Ex parte Henderson*, 2020 Tex. Crim. App. Unpub. LEXIS 171, at *2 (Tex. Crim. App. Apr. 15, 2020).  Other Applicants' cases have been remanded to the habeas court for considerations on the merits.  Again, see the following unpublished opinions: *Ex parte Lewis*, WR-86,572-01, 2020 WL 5540550, at *1 (Tex. Crim. App. Sept. 16, 2020); *Ex parte Butler*, WR-41,121-03, 2019 WL 4464270, at *2 (Tex. Crim. App. Sept. 18, 2019).  Though these cases are not authority, our factual-sufficiency determination, as well as our decision to remand for a new punishment hearing, in the present case are consistent with these cases.

determination of his intellectual disability.  The evidence in this case is legally sufficient for the jury to reject Appellant's intellectual disability claim.  As such, and based on the record before us, Appellant has not been shown to be categorically ineligible for the imposition of the death penalty.  However, the  jury's rejection of Appellant's affirmative defense of intellectual disability was against the great weight and preponderance of the evidence.  Accordingly, we vacate Appellant's death sentence and remand this cause for a new punishment hearing.

Filed: May 12, 2021

Publish